**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

WSOU INVESTMENTS, LLC d/b/a
BRAZOS LICENSING AND
DEVELOPMENT,

               Plaintiff,

      v.

MICROSOFT CORPORATION,

             Defendant.

Civil Action No. 6:20-cv-454
Civil Action No. 6:20-cv-461
Civil Action No. 6:20-cv-465

PUBLIC VERSION

███████████████████

**MICROSOFT CORPORATION'S MOTION TO EXCLUDE IMPROPER DAMAGES**
**OPINIONS AND TESTIMONY OF WSOU'S EXPERTS**

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................1

II. BACKGROUND ................................................................................................2

    A.  The Asserted Patents and Accused Products ...............................................2

        1.  The '702 Patent (-461 Action) .................................................2

        2.  The '160 Patent (-454 Action) .................................................2

        3.  The '902 Patent (-465 Action) .................................................3

    B.  WSOU's Expert Reports ..............................................................................4

        1.  Apportionment ........................................................................4

        2.  Incremental Profits ..................................................................5

III. LEGAL STANDARDS .....................................................................................5

IV. WSOU'S REASONABLE ROYALTY OPINIONS SHOULD BE EXCLUDED. ............7

    A.  Dr. McClellan's Technical Apportionment Analysis for the '702 Patent Based on Aruba ClearPass Is Conclusory And Should Be Excluded. .....................7

    B.  Dr. McClellan Failed To Apportion Out Non-Patented Features Of The Accused Products For The '160 And '902 Patents. .................................13

        1.  The '160 Patent .....................................................................13

        2.  The '902 Patent .....................................................................15

    C.  Messrs. Blok's And Bratic's Incremental Profits Analysis Is Not Tied To The Patents-In-Suit Or To The Accused Products. ...........................................17

V.  CONCLUSION..................................................................................................20

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*CloudofChange, LLC v. NCR Corp.*,
    6:19-CV-00513-ADA (W.D. Tex. Nov. 9, 2021).......................................................10, 11, 12

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993)........................................................................................................6, 7

*Droplets, Inc. v. Yahoo, Inc.*,
    Case No. 12-cv-03733-JST (N.D. Cal. Jan. 12, 2022).......................................................19, 20

*Elder v. Tanner*,
    205 F.R.D. 190 (E.D. Tex. 2001)...................................................................................6

*Ericsson, Inc. v. D–Link Sys., Inc.*,
    773 F.3d 1201 (Fed. Cir. 2014)....................................................................................16

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*,
    879 F.3d 1332 (Fed. Cir. 2018)...........................................................10, 13, 14, 16

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
    879 F.3d 1299 (Fed. Cir. 2018)..............................................................................15, 16

*Guardant Health, Inc. v. Found. Med., Inc.*,
    No. CV 17-1616-LPS-CJB, 2020 WL 2461551 (D. Del. May 7, 2020), report
    and recommendation adopted, No. CV 17-1616-LPS-CJB, 2020 WL 5994155
    (D. Del. Oct. 9, 2020) .........................................................................................10

*Knight v. Kirby Inland Marine Inc.*,
    482 F.3d 347 (5th Cir. 2007) .................................................................................6

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999).............................................................................................6

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
    694 F.3d 51 (Fed. Cir. 2012)................................................................................10

*MLC Intell. Prop. LLC v. Micron Tech., Inc.*,
    10 F.4th 1358 (Fed. Cir. 2021) ........................................................................14, 15, 16

*NetFuel, Inc. v. Cisco Sys. Inc.*,
    Case No. 5:18-cv- 02352-EJB, 2020 WL 1274985 (N.D. Cal. Mar. 17, 2020) ....................10

ii

*Niazi Licensing Corp. v. St. Jude Med. S.C.*,
   No. 2021-1864, ___ F.4th ___, 2022 WL 1072909 (Fed. Cir. Apr. 11, 2022)....................14, 16

*Summit 6, LLC v. Samsung Elecs. Co.*,
   802 F.3d 1283 (Fed. Cir. 2015)................................................................................6, 7

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011)................................................................................18

*United States v. Hicks*,
   389 F.3d 514 (5th Cir. 2004) ...................................................................................7

*United States v. Valencia*,
   600 F.3d 389 (5th Cir. 2010) ...................................................................................6

**Other Authorities**

Fed. R. Evid. 104(a)................................................................................................7

Fed. R. Evid. 702 ...................................................................................................1

iii

**LIST OF EXHIBITS**

| Dec. Ex. | Document Name | Document Abbreviation |
|---|---|---|
| Ex. A | U.S. Patent No. 7,106,702 | '702 Patent |
| Ex. B | U.S. Patent No. 7,366,160 | '160 Patent |
| Ex. C | Excerpts of the Expert Report of Dr. Stan McClellan - Infringement of U.S. Patent No. 7,106,702 by Microsoft Corporation (Feb. 1, 2022) | McClellan 702 Inf. Rept. |
| Ex. D | Excerpts of the Rebuttal Expert Report of Mark Coates Ph.D. Regarding U.S. Patent No. 7,366,160 (Mar. 1, 2022) | Coates 160 Rebuttal Rept. |
| Ex. E | Excerpts of the Rebuttal Expert Report of Mark Coates Ph.D. Regarding U.S. Patent No. 8,274,902 (Mar. 1, 2022) | Coates 902 Rebuttal Rept. |
| Ex. F | Excerpts of the Expert Report of Dr. Stan McClellan – Infringement of U.S. Patent No. 8,274,902 (Feb. 1, 2022) | McClellan 902 Inf. Rept. |
| Ex. G | Excerpts of Expert Report of Justin R. Blok and Walter Bratic (Feb. 1, 2022) | Blok Rept. |
| Ex. H | Excerpts of the Draft Testimony of Stan McClellan, Ph.D. (Mar. 31, 2022) | McClellan Dep. (Rough) |
| Ex. I | Excerpts of the Rebuttal Expert Report of Alan DeKok Regarding U.S. Patent No. 7,106,702 (Mar. 1, 2022) | DeKok Rebuttal Rept. |
| Ex. J | Excerpts of the Rebuttal Report of Jeffrey A. Stec, Ph.D. (Mar. 1, 2022) | Stec Rept. |
| Ex. K | *CloudofChange, LLC v. NCR Corp.*, 6:19-CV-00513-ADA, Dkt. 205 (W.D. Tex. Nov. 9, 2021) | *CloudofChange* Order |
| Ex. L | Excerpts of *CloudofChange, LLC v. NCR Corp.*, 6:19-CV-00513-ADA, Dkt. 127 (Apr. 29, 2021) | *CloudofChange* Pretrial Tr. |
| Ex. M | Excerpts of the Draft Testimony of Justin R. Blok (Mar. 23, 2022) | Blok Dep. (Rough) |
| Ex. N | *Droplets, Inc. v. Yahoo, Inc.*, Case No. 12-cv-03733-JST, Dkt. 1000 (N.D. Cal. Jan. 12, 2022) | *Droplets* Order |

## I.    INTRODUCTION

Defendant Microsoft Corporation ("Microsoft") hereby moves to exclude certain damages-related opinions of Plaintiff WSOU's experts, Dr. Stan McClellan and Messrs. Justin Blok and Walter Bratic, under Federal Rule of Evidence 702.  In these three related cases, WSOU's damages experts, Messrs. Blok and Bratic, have offered opinions through their expert report setting forth proposed damages related to Microsoft's alleged infringement of three patents-in-suit[1] in the form of reasonable royalties.  Their analysis suffers from at least two defects that render their opinions unreliable and correspondingly inadmissible.

First, Messrs. Blok's and Bratic's jointly proposed reasonable royalties are not properly apportioned as to the patented inventions.  For the '702 patent, they rely on the arbitrary and unreliable technical apportionment opinion of Dr. McClellan, WSOU's technical expert.  Dr. McClellan set forth no replicable methodology for his analysis, which rests on a vague, arbitrary set of features for an unaccused product.  Indeed, he concedes that there is no articulable methodology.  This cannot support a reasonable royalty opinion.  For the '160 and '902 patents, neither Dr. McClellan nor Messrs. Blok and Bratic perform any apportionment analysis, even though the accused products have both allegedly infringing and incontestably non-infringing features.  This failure to apportion undermines the proposed royalty determination.

Second, Messrs. Blok and Bratic derive their reasonable royalty by applying an untested and arbitrary allocation of incremental profits between Microsoft and licensors of the asserted patents in a hypothetical negotiation.  By using Microsoft's company-wide R&D-to-operating

---

[1] The three patents at issue in these cases (collectively, the "asserted patents" or "patents-in-suit") are:  U.S. Patent Nos. 7,106,702 ("the '702 patent"), 7,366,160 ("the '160 patent"), and 8,274,902 ("the '902 patent").

expense ratio, Messrs. Blok and Bratic fail to sufficiently tie their analysis to the patents-in-suit, the accused products, or any facts of these cases.

Accordingly, the Court should exclude Dr. McClellan's technical apportionment analysis and Messrs. Blok's and Bratic's reasonable royalty analysis.

## II.   BACKGROUND

### A.   The Asserted Patents and Accused Products

#### 1.   The '702 Patent (-461 Action)

The '702 patent describes a system for bringing a backup server having authentication, authorization, and accounting (AAA) functions online when a server that performs AAA functions is disconnected.  *See, e.g.*, '702 Patent, Abstract, 1:25-26, 2:7-16.  In the -461 Action, WSOU has accused Network Policy Server ("NPS"), a feature of Windows Server, of infringing the '702 patent.[2]  NPS is Microsoft' implementation of a RADIUS server.  The RADIUS protocol is a common AAA protocol and a RADIUS server (which would run according to the AAA protocol) is an example of a AAA server.

#### 2.   The '160 Patent (-454 Action)

The '160 patent seeks to predict when a service on a network (e.g., a video call) will fail. Specifically, the '160 patent describes monitoring and measuring multiple "parameters of a network."  '160 Patent, 2:67-3:3.  The patent suggests that these parameters are network-health metrics specified in a Service Level Agreement and extrapolated or calculated from directly-

---

[2] Dr. McClellan's infringement report refers to "Network Policy and Access Services" (NPAS), a "role" which includes NPS, and included additional features in older versions of Windows Server.  (*See* McClellan 702 Inf. Rept., ¶10.)

measured network-health metrics – e.g.,"packet loss" is a parameter of a network, determined from directly-measured network-health metrics such as the count of packets in and packets out.

In the -454 Action, WSOU accuses Microsoft's Azure Monitor of infringing the '160 patent.  Azure Monitor is a collection of network monitoring functions, services, and resources within Microsoft Azure, a cloud platform.  https://azure.microsoft.com/en-us/services/monitor/#features.  Microsoft Azure offers many services, including database and storage services, networking, and specialized services for application development, machine learning and artificial intelligence, internet over things, mixed reality, game development, business insights, and virtual desktops.  (*See* Coates 160 Rebuttal Rept., ¶¶35-37.)  Azure Monitor, in turn, is a small feature that supports the services that draw users to Azure by also allowing them to collect and analyze the data that their services generate.  (*Id.*, ¶38.)  At a high level, Azure Monitor collects two types of data:  metrics and logs.  (*Id.*, ¶40.)  As described in further detail below, logs are indisputably not addressed or covered by the '160 patent.

### 3.      The '902 Patent (-465 Action)

The '902 patent is directed to estimating the performance of links (e.g., connections between servers, routers, base stations) on the "inside" of a network based on measurements taken from nodes on the "end" of that network (e.g., mobile phones).  In particular, the '902 patent is focused on a mechanism whereby a single "point" (e.g., a computer) on the network measures the "packet loss rate" of end points and uses those measurements to estimate the packet loss rates of network connections or "links" on the inside of the network.

In the -465 Action, WSOU accuses Azure Monitor, Network Performance Monitor ("NPM"), and Network Watcher of infringing the '902 patent.  Like Azure Monitor, NPM and Network Watcher are small services within the Azure cloud platform.  Azure Monitor and

Network Watcher are separate monitoring software.  Azure Monitor performs a more general function by "collect[ing] data . . . from Azure platform and resources, custom applications, and agents running on virtual machines" while Network Watcher performs a more specific function by "provid[ing] tools to monitor, diagnose, view metrics, and enable or disable logs for resources in an Azure virtual network."  (Coates 902 Rebuttal Rept., ¶37 (citing McClellan 902 Inf. Rept., ¶¶20-21).)  NPM allows a user to measure specific types of data between two points on a network.  For example, NPM allows a user to monitor packet losses and latency across a variety of computing environments.  (*Id.*, ¶¶39-41.)  As discussed in further detail below, monitoring latency is indisputably not covered by the '902 patent.

### B.    WSOU's Expert Reports

#### 1.    Apportionment

In their joint damages report, Messrs. Blok and Bratic rely on the technical analysis of Dr. McClellan for a number of purposes.  As part of their purported apportionment analysis, Messrs. Blok and Bratic asked Dr. McClellan to weight the features and functionalities in a third party product, Aruba ClearPass (which implements the RADIUS protocol), and to provide a weighting of relative technological contributions of the '702 Patent to the features he identified. (*See* Blok Rept., Appendix B, ¶167.)  Based on Dr. McClellan's opinion, Messrs. Blok and Bratic then assume that 91.5 percent of the overall benefits and functionalities provided by Aruba ClearPass are comparable to the benefits provided by the '702 Patent.  Messrs. Blok and Bratic apply this 91.5 percent figure in their damages calculations.  (*See, e.g.*, *id.*, Appendix B, ¶¶167-70.)  But as detailed below, Dr. McClellan's opinions as to ClearPass are facially conclusory and not based on any replicable, reliable methodology.

4

For the '160 and '902 patents, neither Dr. McClellan nor Messrs. Blok and Bratic perform any apportionment at all.  Instead, Messrs. Blok and Bratic rely on Dr. McClellan's conclusory assertions that the patents cover the entirety of the accused products.  (*See, e.g.*, *id.*, Appendix A at ¶¶161-62.)  As explained below, however, Dr. McClellan's own deposition testimony indicates that this is not true even under his infringement theories, such that failure to apportion renders the reasonable royalty opinions of Messrs. Blok and Bratic inadmissible under Rule 702.

### 2.    Incremental Profits

In deriving their proposed reasonable royalties as to every asserted patent, Messrs. Blok and Bratic apply the ratio of Microsoft's research and development ("R&D") expenses to operating expenses (the "R&D-to-operating expenses ratio").  (Blok Rept., Appendix A, ¶181, Appendix B, ¶183.)  They assert that "it is reasonable to expect that the parties [to the hypothetical negotiation] would have considered Microsoft's R&D-to-operating expenses ratio in order to determine how to split the incremental benefits Microsoft obtained from practicing" the asserted patents.  *Id.*, Appendix A, ¶183., Appendix B, ¶185.  Messrs. Blok and Bratic then use Microsoft's company-wide R&D expenses to operating expenses ratio to divide the alleged incremental profits for the accused services between the patent owner and Microsoft, rather than any financial data relating specifically to the accused technology or asserted patents.

## III.   LEGAL STANDARDS

An expert witness may provide opinion testimony only if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the

testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

Rule 702 requires the district court to act as a gatekeeper to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–93 (1993). The "basic gatekeeping obligation" articulated in *Daubert* applies not only to scientific testimony but to all expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999). Accordingly, "a district court may exclude evidence that is based upon unreliable principles or methods, legally insufficient facts and data, or where the reasoning or methodology is not sufficiently tied to the facts of the case." *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1295 (Fed. Cir. 2015). A district court shall consider "whether the theory or technique the expert employs is generally accepted; whether the theory has been subjected to peer review and publication; whether the theory can and has been tested; whether the known or potential rate of error is acceptable; and whether there are standards controlling the technique's operation." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007) (citing *Daubert,* 509 U.S. at 593). The ultimate inquiry in a Rule 702 determination is whether the expert's testimony is sufficiently reliable and relevant to be helpful to the finder of fact and thus to warrant admission at trial. *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010). Accordingly, conclusory opinions "without any elaboration or reasoning" should be excluded as they "will not assist the trier of fact." *Elder v. Tanner*, 205 F.R.D. 190, 193-94 (E.D. Tex. 2001). "It is not sufficient simply to list the resources [the expert] utilized and then state an ultimate opinion without some discussion of their thought process." *Id.* at 194.

The proponent of expert testimony bears the burden of showing, by a preponderance of the evidence, that the expert is qualified under Rule 702. See Fed. R. Evid. 104(a); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592, n.10 (1993); *United States v. Hicks*, 389 F.3d 514, 525 (5th Cir. 2004) ("The proponent of expert testimony [] has the burden of showing that the testimony is reliable.").

## IV.   WSOU'S REASONABLE ROYALTY OPINIONS SHOULD BE EXCLUDED.

### A.   Dr. McClellan's Technical Apportionment Analysis for the '702 Patent Based on Aruba ClearPass Is Conclusory And Should Be Excluded.

With regard to the '702 Patent, Dr. McClellan's "technical apportionment" analysis consists of twelve paragraphs that are unsupported by any citation.  (*See* McClellan 702 Inf. Rept., ¶¶38-49.)[3]  Dr. McClellan arrives at his technical apportionment based on a minimal description of the third-party Aruba ClearPass system, which he asserts contains "features . . . which are comparable to the Microsoft NPAS solution[.]"  (*Id.*, ¶39.)  His apportionment analysis therefore relates to an unaccused product, rather than being tied to the specific facts of this case as required under Rule 702.  *See Summit 6*, 802 F.3d at 1295.

In comparing ClearPass to NPS, Dr. McClellan lists five allegedly similar features.  (McClellan 702 Inf. Rept., ¶39.)  This list of features is arbitrary and incomplete.  As Dr. McClellan admitted at his deposition, ClearPass includes features far beyond the five that he listed.  (McClellan Dep. (Rough), 39:17-41:5 ("The product offers an enormous amount of features that are not implicated by the asserted claims of the patent, so those are not even in

---

[3] Although Dr. McClellan's Infringement Report includes a section on legal standards, he does not recite any legal standards concerning apportionment.  (*See* McClellan 702 Inf. Rept. at ¶¶61-73.)

consideration in this evaluation.").)  In fact, the RADIUS standard (which ClearPass implements) include hundreds of features that are unaccounted for in Dr. McClellan's description.  (*See* DeKok Rebuttal Rept., ¶111.)

The same is true for the five "feature sets" that Dr. McClellan includes in his table of the "Technical Importance and Weight of the Features" of ClearPass to conclude that 91.5% of the overall benefits and functionalities provided by Aruba ClearPass are comparable to the benefits provided by the '702 Patent.  (McClellan 702 Inf. Rept., ¶¶40-49):

| Feature Set | Technical Weight | Attributable | Relative Contribution |
|---|---|---|---|
| User Authentication and Extensible Protocol Support | 30% | 80% | 24% |
| Policy-Based Authorization | 25% | 100% | 25% |
| Distributed User Database and Accounting Logs | 10% | 100% | 10% |
| AAA Server Groups and Failover | 25% | 90% | 22.5% |
| AAA Server Activation and Deactivation | 10% | 100% | 10% |
| **Total** | **100%** | | **91.5%** |

*Table 1: Feature-Weighting Analysis of Third-Party Features and Functionalities*

Ignoring hundreds of features of the RADIUS standard, and numerous additional features of ClearPass, Dr. McClellan simply assigns 100 percent of the "technical weight" of ClearPass to his arbitrarily selected set of five features.  Dr. McClellan's assumption that these features make up 100 percent of the weight of the patents is entirely conclusory, and inconsistent with his testimony that ClearPass has numerous features that are not captured by the table.  (*See* McClellan Dep. (Rough), 39:17-41:5.)  Dr. McClellan's report provides no basis for identifying these specific features for his analysis, nor does he identify any support for his opinion that they provide 100 percent of the functionality and benefits of ClearPass.  Indeed, Dr. McClellan admitted that he selectively evaluated only features of ClearPass "that were implicated by the

asserted claims of the '702 patent[,]" (*id.*, 22:12-24) while deliberately not assigning any value to features that "aren't implicated by the asserted claims," (*id.*, 24:23-25:14); (*see also id.*, 26:11-20 (testifying that five or six "key features" of ClearPass are not included in his table because they "have no particular value in terms of being implicated by the asserted claims.· They have no particular value in the offering of a AAA functionality."); (*id.*, 40:15-18 ("any features and benefits of the Aruba ClearPass solution that weren't implicated by the asserted claims of the patent are not something that's even considered.").)

Moreover, Dr. McClellan provides no support for the specific technical weights he assigns to each features set.  For example, for three features ("User Authentication and Extensible Protocol Support", "Policy-Based Authorization", and "AAA Server Groups and Failover"), Dr. McClellan states that "the technical weight for this feature is relatively high." (McClellan 702 Inf. Rept., ¶¶41-42, 44.)  He goes on to assign a technical weight of 30 percent to two of those features, and 25 percent to the other.  Yet he concedes that his report provides no explanation for how he arrived at these different figures, and he testified at deposition that he did not perform any calculations or otherwise replicable process to reach these numerical weights. (McClellan Dep. (Rough), 32:2-6 (agreeing that his "report doesn't tell me how to replicate your process of arriving at these specific numbers")); (*id.* at 27:20-28:4 ("it's an apportionment. There are no calculations.  It's not a – it's not something that's calculable.  It's an apportionment based on an assessment.  There's no equation that would allow you to calculate that is what I'm saying.").)

Dr. McClellan's evaluation of the weight of each feature attributable to the '702 patent suffers from the same defect.  He arbitrarily assigns values of 80 percent, 90 percent, or 100 percent, stating in conclusory fashion that "the majority of this feature is dependent on the

asserted claims of the patent-in-suit" or the features "in their entirety are dependent on the asserted claims of the patent-in-suit."  (*See* McClellan 702 Inf. Rept., ¶¶46-49.)  Dr. McClellan does not perform any analysis related to the asserted claims in stating these opinions, nor does he set forth any methodology or basis for how he reached these conclusions.  His apportionment lacks any factual foundation; it is wholly *ipse dixit*.

As this Court has previously recognized, this type of apportionment analysis "is exactly the kind of 'plucked out of thin air' apportionment that the Federal Circuit and many other district courts have rejected."  *CloudofChange, LLC v. NCR Corp.*, 6:19-CV-00513-ADA, Dkt. 205 at 7 (W.D. Tex. Nov. 9, 2021) ("*Cloudofchange* Order") (collecting cases); *see also Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1351 (Fed. Cir. 2018) (excluding an expert's damages opinion where the expert "plucked the 5% royalty rate out of nowhere" because it "is not enough for an expert to simply assert that a particular royalty rate is reasonable in light of evidence without tying the proposed rate to that evidence"); *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 69 (Fed. Cir. 2012) (rejecting apportionment that was "plucked out of thin air based on vague qualitative notions of the relative importance of the [accused technology]"); *NetFuel, Inc. v. Cisco Sys. Inc*., Case No. 5:18-cv-02352-EJB, 2020 WL 1274985, at *9 (N.D. Cal. Mar. 17, 2020) (excluding apportionment analysis where the expert "failed to provide the methodology underlying his apportionment amount or explain how he arrived at that figure based on the facts of this case"); *Guardant Health, Inc. v. Found. Med., Inc.*, No. CV 17-1616-LPS-CJB, 2020 WL 2461551, at *18–19 (D. Del. May 7, 2020), report and recommendation adopted, No. CV 17-1616-LPS-CJB, 2020 WL 5994155 (D. Del. Oct. 9, 2020) (excluding a technical expert's 50% apportionment analysis, where the expert failed to tie the relative value of the patented features to the accused products).

10

The facts of *CloudofChange* are strikingly similar.  The technical expert ("Crouse") identified four components that he said constituted the "core functions" of the system, and opined that approximately 80 percent of the accused system embodied the asserted patented components of the patents-in-suit.  *CloudofChange* Order at 6.  He explained:

> Based on my review, it is my opinion that every element of the asserted claims of the CloudofChange Patents are contained in the accused NCR Silver Essentials system. It is my opinion that approximately 80% of the NCR Silver Essentials product embodies the asserted patented components of the CloudofChange Patents. My opinion of this approximate 80% apportionment is based on my analysis of the value of the patented components based on the importance of the patented components to the function of the POS system in the manner intended. Accordingly, because the patented components make up approximately 80% of the essential functionality of the POS system, additional options such as security and reporting features and other add-on features customized for specific uses such as restaurants, fall into categories that are nice to have, but that are not essential to a functioning POS system. Accordingly, I attribute approximately 20% to all add on components above the essential approximately 80% represented by the CloudofChange Patents for a POS system.

*Id.* at 6-7.  This explanation provides more detail than Dr. McClellan's report does for any ClearPass feature.  *Compare id. with* McClellan 702 Inf. Rept. at ¶¶41-49.  Yet the Court agreed with the defendant ("NCR") that "Crouse's percentage calculation is conclusory and that NCR has 'no way to understand or meaningfully rebut that number.'"  *Id.* at 7.  The Court explained:

> Nowhere in Crouse's report does Crouse explain how he reached his "80% apportionment" of the accused product to the patented features, nor does he provide any factual foundation to support this 80% apportionment.  In his opening report, Crouse simply offers no explanation on how he reaches this 80% apportionment. Therefore, this Court will exclude Crouse's apportionment opinion

11

> since his 'reasoning or methodology is not sufficiently tied to the facts of the case.'

*Id.* (quoting *Summit 6*, 802 F.3d at 1295).

The same is true here. Dr. McClellan never explained how he reached the stated percentages, and he testified that he did not perform any calculations that could be replicated. Microsoft therefore cannot meaningfully rebut his apportionment opinions, which should be excluded.

Similarly, Messrs. Blok and Bratic should not be permitted to rely on Dr. McClellan's analysis to support their damages opinions. As the Court explained in *CloudOfChange*, "In patent infringement cases, a damages expert may rely on a technical expert's technical analysis regarding which components of the accused products are attributable to the patented invention and the economic value of those components." *Id.* at 6 (citing *Realtime Data, LLC v. Oracle Am., Inc.*, 2017 U.S. Dist. LEXIS 187717 at *14 (E.D. Tex. Mar. 22, 2017). "However, 'the reasoning and methodology underlying a proffered expert opinion [must be] scientifically valid and that the reasoning and methodology [must be] applied properly to the facts in issue.'" *Id.* (quoting *Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 196 (5th Cir. 1996). "For every conclusion contained in the expert's proposed testimony, the Court must determine if the methodology leading to that conclusion is sound." *Id.* Because Dr. McClellan did not set forth a scientific methodology for how he performed his apportionment analysis, WSOU's damages experts cannot rely on that analysis in their own opinions or testimony. *See CloudofChange* Pretrial Tr. at 23 (holding that damages expert was "not going to have a basis to talk about the 80 percent without having a technical person explaining how he came up with it . . . in a

report . . . that he can then be cross-examined on."), 25 ("I'm not going to allow [damages expert] to give any opinion that is based on Mr. Crouse's opinion with regard to 80 percent.").

**B.    Dr. McClellan Failed To Apportion Out Non-Patented Features Of The Accused Products For The '160 And '902 Patents.**

**1.    The '160 Patent**

Dr. McClellan did not perform any apportionment analysis of the '160 Patent.  Instead, he simply stated that these patents cover the entirety of the accused products.  *See, e.g.*, (Blok Rept.) Appendix A, ¶161 (quoting McClellan 160 Inf. Rept., Section 2) ("The asserted claims [of the '160 patent] thus cover the entirety of Microsoft Azure and Azure Monitor, not just a portion or feature of them.").)  This statement is belied by the record evidence, including Dr. McClellan's own deposition testimony, and the reliance of Messrs. Blok and Bratic on this statement warrants and corresponding failure to apportion out unpatented features of the accused products warrants exclusion of their reasonable royalty opinions.

For example, Messrs. Blok and Bratic explain that "[d]ata and information collected by Azure Monitor are categorized as either 'metrics' or 'logs.'  (Blok Rept., Appendix A, ¶18) (citation omitted).)  They also explicitly describe the use of "logs" in Azure Monitor.  (*See id.*) ("Logs in Azure Monitor are capable of consolidating data from multiple sources into a single workspace and perform sophisticated analysis to identify critical patterns.").  But at his deposition, Dr. McClellan admitted that the claims of the '160 patent do *not* cover the use of logs or storing data.  (McClellan Dep. (Rough), 137:22-138:7 ("I don't see where the making use of logs is anywhere related to the claim language."), 135:11-18 ("The claim has nothing to do with logs or storage of data, as we previously discussed.").)  However, because neither Dr. McClellan

13

nor Messrs. Blok and Bratic apportioned out the use of logs to store data, this non-infringing use of Azure Monitor is included in their royalty base.

WSOU attempts to circumvent the apportionment requirement by citing the Federal Circuit's decision in *Exmark*  (*See* Blok Rept., Appendix A, ¶¶163 & n. 348.)  But nothing in *Exmark* suggests that WSOU's conclusory damages opinion is admissible.  In *Exmark*, the Federal Circuit held that using accused lawn mower sales as the royalty base was permissible because the claims at issue expressly recited a lawn mower.  "Thus, claim 1 covers the infringing product as whole, not a single component of a multicomponent product. There is no unpatented or non-infringing feature of the product." *Exmark*, 879 F.3d at 1347.  That is not the case here. The claims of the '160 patent are directed to "[a] method of determining communications network service trends[.]" '160 Patent, Cl. 1 (Preamble).  But Azure Monitor has many features and functions entirely unrelated to determining communications network service trends, including the use of logs to store data, as Dr. McClellan admitted.[4]

Thus, assuming *arguendo* that Microsoft infringes the '160 patent, under Dr. McClellan's own testimony, Azure Monitor has both patented *and unpatented* features.  Accordingly, in order to recover damages, WSOU must apportion only to the patented features of the accused product. *See Niazi Licensing Corp. v. St. Jude Med. S.C.*, No. 2021-1864, __ F.4th __, 2022 WL 1072909,

---

[4] In their joint Report, Messrs. Blok and Bratic analyzed pricing for several different metrics in Azure Monitor.  (*See* Blok Rept., Appendix A at ¶124 (showing Microsoft pricing for "Application Insights" and "Health Monitoring" features)); (Blok Dep. (Rough), 95:9-96:16.)  At his deposition, Mr. Blok testified that the revenues Microsoft gains from these features are *not* convoyed, but "are generated from the teachings of the '160 patent."  (Blok Dep. (Rough), 96:17-97:14.)  But Dr. McClellan did not perform any infringement analysis regarding these features.  Therefore, there is no technical basis supporting Mr. Blok's opinion, and his analysis related to this pricing information must be struck under Rule 702.

at *13 (Fed. Cir. Apr. 11, 2022) ("Damages should be apportioned to separate out noninfringing uses"); *MLC Intell. Prop. LLC v. Micron Tech., Inc.*, 10 F.4th 1358, 1373 (Fed. Cir. 2021) ("We have repeatedly held that when the accused technology does not make up the whole of the accused product, apportionment is required.") (citing *Exmark*, 879 F.3d at 1348); *see also Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1309 (Fed. Cir. 2018) ("[T]he ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more.") (quoting *Ericsson, Inc. v. D–Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014)).  The failure to do so requires exclusion of the reasonable royalty opinions of Messrs. Blok and Bratic.  *MLC*, 10 4th 1358 at 1373 (affirming district court's exclusion of expert opinion on reasonable royalty because expert "did not properly apportion either the royalty base or the royalty rate to account for the patented technology.").

### 2.    The '902 Patent

The same fatal flaw plagues WSOU's experts' opinions regarding the '902 patent.  Dr. McClellan's technical reports regarding the '902 patent make no mention of apportionment.  He opines that "[t]he asserted claims of the '902 patent cover the entire concept of collecting 'sparse' data related to network performance as a means of inferring performance on segments of the network where the expense and complexity of deploying monitoring may be prohibitive." (McClellan 902 Inf. Rept., ¶35); (*see also id.*, ¶39 ("The '902 Patent teaches the entire concept of using sparse or incomplete data related to network degradation (packet loss) to estimate network degradation on network paths or links which are not directly monitored.").)

> In other words, the '902 Patent invented the concept of the capabilities implemented by Microsoft in Azure and Azure Monitor, via monitoring capabilities such as Network Watcher and

15

> Network Performance Monitor, which rely on sparse monitoring to
> estimate packet loss in a communication network. They are not
> directed to a specific feature of Microsoft Azure or Azure
> Monitor—they are directed to Azure and Azure Monitor as a
> whole.

(*Id.*, ¶40.)

Again, however, Dr. McClellan's deposition testimony belies his opinion, as he testified that NPM and Network Watcher include features that are not covered by the asserted claims of the '902 patent.  For example, Dr. McClellan's report refers to Microsoft documentation stating that NPM can "[m]onitor loss and latency across various subnets and set alerts."  (*Id.*, ¶21.)  The '902 patent claims recite collecting packet loss data and estimating packet loss rate, but say nothing about latency or setting alerts.  And Dr. McClellan testified that loss and latency are two distinct concepts, and that "setting an alert" is not the same as collecting loss data or estimating packet loss rate.   (McClellan Dep. (Rough) 197:4-23); (*see also id.*, 198:12-20 ("Claim 1 of the '902 patent . . . doesn't say anything about setting alerts.").)  Accordingly, monitoring latency and setting alerts are at least two features of the accused products that WSOU is required to apportion out of its proposed royalty base.  But neither Dr. McClellan nor Messrs. Blok and Bratic did so.

For their part, Messrs. Blok and Bratic's report does not include an independent discussion of the '902 patent in addressing the issue of apportionment.  Instead, they repeat Dr. McClellan's misstatement that the '902 patent entirely covers the accused products to justify their use of U.S. revenues for Azure Monitor as a whole to arrive at their proposed royalty base. (*See* Blok Rept., Appendix A, ¶162.)  This is improper for the same reasons discussed above regarding the '160 patent, and Messrs. Blok's and Bratic's reasonable royalty opinions for the '902 patent should be excluded also.  *See Niazi*, __ F.4th __, 2022 WL 1072909, at *13; *MLC* 10

F.4th at 1373; *Exmark*, 879 F.3d at 1348; *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d at 1309; *Ericsson*, 773 F.3d at 1226.

    **C.**    **Messrs. Blok's And Bratic's Incremental Profits Analysis Is Not Tied To The Patents-In-Suit Or To The Accused Products.**

Messrs. Blok's and Bratic's allocation of alleged incremental profits based on the ratio of Microsoft's R&D-to-operating expenses is arbitrary, speculative, unreliable, and unsupported for the purposes of determining reasonable royalty damages.  As such, it should be excluded.

For all three patents, Messrs. Blok and Bratic assert that "[t]he parties to the hypothetical negotiation would have recognized that this ratio represents the portion of Microsoft's costs attributable to technology development, as compared to its costs associated with commercializing" the accused products.  (Blok Rept., Appendix A, ¶181, Appendix B, ¶183.) They further opine that "Microsoft's R&D-to-operating expenses ratio is reflective of Microsoft's own determination of how much money it should invest in technology development relative to the overall cost of product commercialization."  (*Id.*, Appendix A, ¶183, Appendix B, ¶185.)  Accordingly, they assert that the R&D-to-operating expenses ratio is "a reasonable measure of the contribution of" the contributions of all three asserted patents to Microsoft's apportioned incremental benefits from the accused products.  (*See id.*)  Messrs. Blok and Bratic do not cite any authority for these assertions.  They do not nor do they identify any case in which a court has approved of this methodology.  And Mr. Blok testified that he was not aware of any Microsoft documentation endorsing this methodology for evaluating any specific patent.

Critically, this method is flawed at least because Messrs. Blok and Bratic use *company-wide* R&D and operational expenditures to generate their proposed damages figures, rather than making any attempt to identify R&D and operational expenditures that actually relate to the

17

accused products (*e.g.*, Windows Server, Azure Monitor).  As a result, this methodology yields an identical 42.3% to 57.7% split of incremental profits between Nokia and Microsoft for both the '160 and '902 patents, despite the fact that the patents cover different technology.  Indeed, Messrs. Blok and Bratic's methodology would produce the same 42.3% to 57.7% incremental profit allocation in *any* patent license negotiation for *any* patented technology as long as the ratio is calculated over an identical time period.  (*See* Stec Rept., 82.)  But this ratio is admittedly unrelated to any specific patented technology, and has no identified relationship to incremental profits generated by any technology.  WSOU cannot credibly argue that Messrs. Blok's and Bratic's method is reliable or based on any sound scientific principle.

Because Messrs. Blok and Bratic use company-wide expenses instead of isolating R&D and operational expenditures specific to the accused products, their methodology necessarily includes Microsoft's R&D expenditures toward activities entirely unrelated to the asserted patents or accused products.  (*See id.*, 83 (discussing Microsoft 2017-2019 10-K forms showing expenses related to LinkedIn and increased investments in cloud engineering, artificial intelligence engineering, gaming, LinkedIn, and GitHub).)  Indeed, Mr. Blok conceded that the R&D and operating expense line items on which he and Mr. Bratic rely are *not* broken out in relation to any particular patent or product.  (Blok Dep. (Rough), 81:13-23); (*see also id.*, 98:23-99:16 (testifying that he does not know whether any of the R&D line items relate to the accused products).)  Messrs. Blok and Bratic do not provide any basis for relying upon expenditures unrelated to the asserted patents or accused products.  (*See, e.g.*, Stec Rept., 79.)

The failure to tie the R&D-to-operating expenses ratio to the patents-in-suit or the accused products constitutes an independent basis for excluding all of Messrs. Blok's and Bratic's incremental profits analyses.  *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292,

1315 (Fed. Cir. 2011) (quoting *Daubert*, 509 U.S. 579, 591 (1993) ("An additional consideration under Rule 702—and another aspect of relevancy—is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.").  Instructive on this issue is the decision in *Droplets, Inc. v. Yahoo, Inc.*, Case No. 12-cv-03733-JST, Dkt. 1000 (N.D. Cal. Jan. 12, 2022).

In *Droplets*, the court excluded a damages expert's profit-split analysis, in part because the expert based his report on the defendant's internal analysis of its ROI, and "fail[ed] to limit its focus to ROIs on investments in items similar to the accused features of the infringing product." *Droplets* Order at 6.  Although the expert limited his analysis to three specific ROIs, the court noted that "[t]he connection between these ROI estimates and [defendant's] profits on [patentee's] technology, however, is unstated." *Id.*  And while the patentee argued that there were similarities between the accused products and the ROIs, the court refused to speculate or gap-fill where the expert did not "offer any explanation for *how* the projects in the historical ROIs are similar to the accused features." *Id.*; *see also id.* ("[T]he onus is on patentee to identify and map these similarities.").

The *Droplets* court also excluded the expert's profit-split analysis based on his reliance on the defendant's "customer lifetime values and its gross profit margins." *Id.* at 7.  Although the expert asserted that these figures were "sign[s] of what [defendant] would be willing to pay" for the patented technology, the court disagreed:

> There is no basis in economics for these assumptions. Neither Nordstrom's gross profits on all of its products nor its costs of acquiring an additional customer are reliable indicators of what it would spend to use Droplets's technology. *See Nat'l Prod., Inc. v. Arkon Res., Inc.*, No. C15-1553-JPD, 2017 WL 5499801, at *2-3 (W.D. Wash. Nov. 16, 2017) (excluding expert testimony that

19

> relied on "estimated cost of goods sold" and "overhead expense"
> percentages that "were not tabulated from actual costs incurred
> from the sale and manufacture of only the accused products, but
> were instead calculated by dividing expenses incurred from the
> sales of all [defendant's] products"). Thus, the Court excludes
> Bergman's opinion based on these factors as well.

*Id.*

Like the expert in *Droplets*, Messrs. Blok and Bratic have not even attempted to explain how the R&D or operating expenditures they rely on relate to the accused features.  Nor have they provided any economic basis for their assumption that Microsoft's company-wide R&D-to-operating expenses ratio reflects its willingness to pay for the specific patented technology at issue in these cases.  Therefore, WSOU cannot meet its burden of showing that the R&D-to-operating expenses ratio is the base of a reliable incremental profits analysis, and the Court should exclude this analysis.

## V.      CONCLUSION

For the foregoing reasons, the Court should exclude the technical apportionment opinions of Dr. McClellan and reasonable royalty opinions of Messrs. Blok and Bratic.


DATED: April 12, 2022                    Respectfully submitted,

                                         */s/ Richard A. Cederoth (by permission)*

                                         Melissa R. Smith, Bar No. 24001351
                                         melissa@gillamsmithlaw.com
                                         James "Travis" Underwood, Bar No.
                                         24102587
                                         travis@gillamsmithlaw.com
                                         **GILLAM & SMITH, LLP**
                                         303 South Washington Avenue
                                         Marshall, Texas 75670

Tel: (903) 934-8450
Fax: (903) 934-9257

Michael J. Bettinger
mbettinger@sidley.com
Irene Yang
irene.yang@sidley.com
Brooke S. Boll
brooke.boll@sidley.com
**SIDLEY AUSTIN LLP**
555 California Street, Suite 2000
San Francisco, CA 94104
Tel: (415) 772-1200
Fax: (415) 772-7400

Richard A. Cederoth
rcederoth@sidley.com
John W. McBride
jwmcbride@sidley.com
Richard M. Chen
rchen@sidley.com
Kevin Robert Oliver
kevin.oliver@sidley.com
**SIDLEY AUSTIN LLP**
1 South Dearborn St.
Chicago, IL 60603
Tel: (312) 853-7000
Fax: (312) 853-7036

***ATTORNEYS FOR MICROSOFT
CORPORATION***

21

**CERTIFICATE OF SERVICE**

I, Kevin Robert Oliver, certify that on April 12, 2022, the documents filed with the Clerk of Court via the Court's CM/ECF system under seal in the above-captioned cases were subsequently served on all counsel of record by electronic mail.

<u>/s/ *Kevin Robert Oliver*</u>
Kevin Robert Oliver
