# EXHIBIT N

Declaration of Kevin Robert Oliver in Support of Defendant Microsoft Corporation's Motion to Exclude Improper Damages Opinions and Testimony of WSOU's Experts

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DROPLETS, INC., <br><br>  Plaintiff, <br><br> v. <br><br> YAHOO! INC., <br><br>  Defendant. | Case No. 12-cv-03733-JST <br><br> **ORDER GRANTING NORDSTROM'S** ***DAUBERT*** **MOTION** <br><br> Re: ECF No. 957 |

Before the Court is Defendant Nordstrom, Inc.'s Second Motion to Exclude Expert Opinions, in which it seeks to exclude the opinion from Jim W. Bergman's Second Supplemental Report that Plaintiff Droplets, Inc. and Nordstrom would have agreed to a 35/65 split of the profits from Nordstrom's use of Droplets's patented technology. ECF No. 957. Because Bergman fails to sufficiently tie his opinions to the facts of the case, the Court will grant the motion.

**I.   BACKGROUND**

   **A.   Procedural History**

On August 9, 2021, the Court granted Nordstrom's motion to exclude the Nordstrom profit split analysis performed by Plaintiff Droplets's damages expert, Jim Bergman. ECF No. 824. On October 21, 2021, the Court granted Droplets leave to file a supplemental report to address the excluded profit split analysis. *See* ECF No. 895 at 2 ("Plaintiff may submit a supplemental report regarding Mr. Bergman's profit-split analysis, curing only the problems identified in the August 9, 2021 order."). Pursuant to the schedule set out in the Court's order, *see id.* at 3, Droplets served Bergman's supplemental report, ECF No. 958-7 (the "Bergman Supplement"), the parties took Bergman's deposition, ECF No. 958-9, and the parties briefed this motion. *See* ECF Nos. 957, 959, 977.

### B. The Bergman Supplement

The Bergman Supplement begins by analyzing certain of the factors set out in *Georgia–Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), including factors number four (patentee's licensing policy), five (parties' competition), and six (convoyed sales). Bergman Supplement ¶¶ 9-13. Finding that factors four and five are neutral and factor six favors Droplets, Bergman concludes that Droplets has a greater hypothetical negotiation bargaining position than Nordstrom. *Id.* ¶ 13.

Bergman then turns to three non-*Georgia-Pacific* factors. First, Bergman cites findings from several Nordstrom return on investment ("ROI") analyses regarding features he claims are similar to the accused features. *Id.* ¶¶ 14-22. Bergman concludes that the data predicts a Droplets/Nordstrom profit split range between 20/80 and 50/50. Second, Bergman cites documents related to Nordstrom's "customer lifetime value," which "represents the discounted lifetime net contribution per customer, including acquisition and retention costs." *Id.* ¶¶ 23-26. Bergman concludes that this data predicts a 38/62 Droplets/Nordstrom profit split. Third, Bergman looks at Nordstrom's overall gross margins and concludes that they reflect a historical willingness to share profits 50/50. *Id.* ¶¶ 27-29.

Attempting to harmonize these disparate factors, Bergman then concludes as follows:

> Based on the analysis above, it is my opinion that, while a *Georgia-Pacific* analysis suggests a profit split to Droplets greater than 50%, Nordstrom would argue that this amount is greater than the historical profit splits ranging between 20% to 50% described above. As a result, it is my opinion that the parties to the hypothetical negotiation would agree that a profit split range between 20% to 50% to Droplets would be reasonable.

*Id.* ¶ 31. Without further analysis, he then concludes that the parties would "agree to split the incremental benefits attributable to the patented technology at 35%/65%, with 35% going to Droplets and 65% going to Nordstrom," an "amount" he characterizes as "ultimately conservative." *Id.* ¶ 33.

//

//

//

2

## II. DISCUSSION

Nordstrom moves to exclude the Bergman Supplement on the grounds that: (1) Bergman's report impermissibly includes profits from non-infringing features of Nordstrom's website without apportionment; and (2) Bergman's opinion relies on factors unrelated to the facts of the case.

### A. Lack of Apportionment

Nordstrom contends that the Bergman Supplement should be excluded because its damages calculation includes profits generated by two non-infringing Nordstrom features: Search Suggest and Quick View. Nordstrom argues that this calculation ignores the principle of apportionment, in which a "patentee is only entitled to a reasonable royalty attributable to the infringing features." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018). Nordstrom previously raised this argument in its first *Daubert* motion, *see* ECF No. 613 at 19-20, but the Court rejected it.[1] *See* ECF No. 824 at 10 ("Defendants seek to require apportionment of features, not just products that contain features. That, however, is not required.").

The Court sees no reason to revisit its prior ruling. Accordingly, the Court denies Nordstrom's motion as to this issue.[2]

### B. Profit Split Analysis

"The patentee bears the burden of proving damages." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011) (citation omitted). To carry this burden, the patentee must "sufficiently [tie the expert testimony on damages] to the facts of the case." *Id.* (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993)); *see also* Fed. R. Evid. 702 (requiring that expert testimony be "based on sufficient facts or data" and "reliably appl[y] the principles and

---

[1] In its previous order, the Court held that each of Nordstrom's accused features appeared to be a single component enabled by several different technologies functioning together to achieve one result. ECF No. 824 at 9. This "entire market value" exception, the Court concluded, "makes the case different from apportionment cases that involve clearly distinct components." *Id.* at 9-10.

[2] Nordstrom says that Search Suggest and Quick View "are not the features accused of infringing." ECF No. 957 at 10. Droplets says that "[w]hat has been accused in this case is the Nordstrom.com website, and, inter alia, the Search Suggest and Quick View features." ECF No. 959 at 10. In light of the conclusions reached in this order, the Court does not resolve this dispute.

methods to the facts of the case"). A district court may exclude evidence where the data used is not sufficiently tied to the facts of the case or the methodology is plagued by logical deficiencies or is otherwise unreasonable. *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015). Having said that, "estimating a reasonable royalty is not an exact science. The record may support a range of reasonable royalties, rather than a single value. Likewise, there may be more than one reliable method for estimating a reasonable royalty." *Id.*

A proper analysis of the *Georgia-Pacific* factors satisfies the admissibility inquiry. *See Uniloc USA, Inc.*, 632 F.3d at 1317. However, an expert must go beyond "reciting each factor and making a conclusory remark about its impact on the damages calculation." *See Whitserve, LLC v. Comp. Packages, Inc.*, 694 F.3d 10, 31 (Fed. Cir. 2012). To satisfy this requirement using a *Georgia-Pacific* analysis, the expert must "tie the relevant *Georgia-Pacific* factors to the . . . royalty rate" and "explain how she calculated [the] royalty rate using these factors." *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*, 879 F.3d 1332, 1349 (Fed. Cir. 2018).

For the reasons below, the Court concludes that the Bergman Supplement relies on factors not sufficiently tied to the case and is thus inadmissible. The Court examines each basis for Bergman's analysis in turn.

### 1. *Georgia-Pacific* Analysis

First, Bergman analyzes three of the *Georgia-Pacific* factors – and concludes they suggest a profit split to Droplets greater than 50%. He opines that factor four, licensing policy, "would not significantly impact the determined royalty" because Droplets "does not want to maintain its patent monopoly." Bergman Supplement ¶ 10. He opines that factor five, the commercial relationship between the parties, also would have no impact on the royalty. *Id.* ¶ 11. As for factor six, which looks at the promotion of sales of other products of the licensee, Bergman asserts that Nordstrom receives significant convoyed sales effects from its use of the patented technology, thereby increasing Droplets's bargaining position in a hypothetical negotiation. *Id.* ¶ 12. Based upon these factors, Bergman concludes that Droplets would have greater bargaining power relative to Nordstrom, *id.* ¶ 13, "suggest[ing] a profit split to Droplets greater than 50%." *Id.* ¶ 31.

To sufficiently tie the *Georgia-Pacific* factor six (convoyed sales effects) to the royalty

4

rate in this case, Bergman was required to explain the extent to which it factored into the value of the accused features and his "greater than 50%" royalty rate. *Exmark*, 879 F.3d at 1349. But Bergman does not perform this task. Bergman's analysis suggests only that Nordstrom receives some amount of benefit from convoyed sales. Bergman Supplement ¶ 12 ("36% of Nordstrom's customers either always, or fairly frequently, visited the website before going to the store, while 92% of customers reported visiting at some point."). It does not explain, mathematically or otherwise, how the convoyed sales factored into the value of the accused features. Nor does it explain how convoyed sales lead to a "greater than 50%" profit split. While Bergman opines that his "analysis results in Droplets hav[ing] a greater bargaining position than Nordstrom in the negotiation," Bergman Supplement ¶ 13, the Bergman Supplement offers nothing in the way of "formula, method, or calculation . . . to explain or justify this [greater than 50%] figure." *See Open Text S.A. v. Box, Inc.*, No. 13-CV-04910-JD, 2015 WL 349197, at *4 (N.D. Cal. Jan. 23, 2015). Stated differently, Bergman does not explain why the factors he identifies "necessarily lead[] to the conclusion that the parties would have agreed to a 50/50 split, and why a 40/60, 30/70, 20/80 or any other split would not have been appropriate." *Vaporstream, Inc. v. Snap Inc.*, No. 17-CV-00220-MLH-KSX, 2020 WL 2543814, at *2-6 (C.D. Cal. Jan. 10, 2020). "There is simply too great an analytical gap between Mr. [Bergman's] 50/50 conclusion and the facts he attempts to rely on." *Id.* (quotation and citation omitted). Thus, this portion of Bergman's analysis is inadmissible.

There is an additional problem with this analysis: stating that a given factor leads to a "greater than 50%" profit split strongly implies that Bergman posited that 50% would be the starting point in the parties' negotiations (else why not say "greater than 40%" or "greater than 70%"). While an expert witness may determine that the parties would split any profits evenly "after considering the facts of the case," *Sanofi-Aventis Deutschland Gmbh v. Glenmark Pharms. Inc., USA*, No. 07-CV-5855-DMC-JAD, 2011 WL 383861, at *13 (D.N.J. Feb. 3, 2011), he may not simply take it as a given that negotiations would start there. *See Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1332 (Fed. Cir. 2014) (rejecting the assumption that negotiations would start at a 50-50 split "without sufficiently establishing that the premises of the theorem actually apply to

5

the facts of the case at hand"); *Dynetix Design Sols., Inc. v. Synopsys, Inc.*, No. 11-CV-05973-PSG, 2013 WL 4538210, at *2 (N.D. Cal. Aug. 22, 2013) (excluding testimony where the expert "impermissibly assumed, based on no facts in this particular case, that the starting point for a hypothetical negotiation would be 50% of the gross profit margin"). Yet that is what Bergman did.

### 2. Nordstrom's Historical ROI

Bergman next bases his report on Nordstrom's internal analyses of its ROI. Nordstrom argues that using ROI as a proxy for royalty rate does not account for Nordstrom's implementation costs; does not reflect the difference in ROI for individual Nordstrom investments; and fails to limit its focus to ROIs on investments in items similar to the accused features of the infringing product. Nordstrom's first two criticisms go to the weight of Bergman's opinions, not their admissibility; its third criticism, however, has more force.

Bergman grounds his analysis on data from a 2014 Nordstrom business effort called "Sell Anywhere Customers Want to Shop." Bergman Supplement ¶ 18. In that effort, Nordstrom set a goal of reaching $20 billion in sales by 2020 by making various investments in its business. It used the estimated ROI on each specific investment to determine which ones to make. *Id.* ¶ 17. In his analysis, Bergman focused on three particular ROI estimates: the ROI on the overall "Sell Anywhere" package of investments, and investments in individual programs called "Search and Navigation" and "Make Your Own @ Nordstrom." *Id.* ¶ 21. The connection between these ROI estimates and Nordstrom's profits on Droplets's technology, however, is unstated. Droplets argues that "Mr. Bergman did select ROIs that had 'some similarity' to the accused features — they are nearly coextensive." ECF No. 961-4 at 15 (emphasis omitted). But in fact, Bergman does not offer any explanation for *how* the projects in the historical ROIs are similar to the accused features. The Court identifies some potential similarities on the face of these products or functionalities – for example, the accused Search Suggest feature appears similar to the ROI's Search Experience feature. But the onus is on Droplets to identify and map these similarities, and the Court will not fill this gap with its own speculation.

Accordingly, the Court excludes the Bergman Supplement on these grounds as well.

6

### 3. Customer Lifetime Values and the Gross Margin

The third and fourth bases for Bergman's profit split are Nordstrom's "customer lifetime values" and its gross profit margins. Customer lifetime value "represents the discounted lifetime net contribution per customer, including acquisition and retention costs." ECF No. 958-7 at 11. Bergman takes Nordstrom's customer lifetime value against its cost of acquiring each additional customer as an indication of what Nordstrom would be willing to pay for the patented technology. *Id.* at 12. He relies on Nordstrom's gross profit margins as another sign of what it would be willing to pay, using similar logic.

There is no basis in economics for these assumptions. Neither Nordstrom's gross profits on all of its products nor its costs of acquiring an additional customer are reliable indicators of what it would spend to use Droplets's technology. *See Nat'l Prod., Inc. v. Arkon Res., Inc.*, No. C15-1553-JPD, 2017 WL 5499801, at *2-3 (W.D. Wash. Nov. 16, 2017) (excluding expert testimony that relied on "estimated cost of goods sold" and "overhead expense" percentages that "were not tabulated from actual costs incurred from the sale and manufacture of only the accused products, but were instead calculated by dividing expenses incurred from the sales of all [defendant's] products"). Thus, the Court excludes Bergman's opinion based on these factors as well.

\*    \*    \*

In sum, the Bergman Supplement relies on factors that are not sufficiently tied to the facts in the case. And even if the Court could conclude otherwise, Bergman's analysis fails because he does not explain how the identified factors compel a 35/65 profit split. *See Virnetx, Inc.*, 767 F.3d at 1333 ("where an expert considers relevant material but fails to provide an opinion explaining how that material leads to his conclusion, [a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered" (citation and quotation omitted)). Instead, Bergman merely concludes that "based upon the range of values suggested by these analyses," the parties would agree upon a 35/65 profit split. Bergman Supplement ¶¶ 32, 33.

//

//

## CONCLUSION

For the foregoing reasons, the Court grants Nordstrom's motion to exclude the Bergman Supplement.

**IT IS SO ORDERED.**

Dated: January 12, 2022

JON S. TIGAR
United States District Judge