**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

WSOU INVESTMENTS, LLC d/b/a
BRAZOS LICENSING AND
DEVELOPMENT,

                    Plaintiff,

      v.

MICROSOFT CORPORATION,

                    Defendant.

Civil Action No. 6:20-cv-454
Civil Action No. 6:20-cv-461
Civil Action No. 6:20-cv-465

PUBLIC VERSION



**MICROSOFT CORPORATION'S MOTION FOR SUMMARY JUDGMENT OF
PATENT INELIGIBILITY OF THE ASSERTED CLAIMS IN
U.S. PATENT NOS. 7,366,160, 8,274,902, AND 7,106,702**

## TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................................... 1

II.  LEGAL STANDARD........................................................................................ 2

III.  THE '160 PATENT'S CLAIMS ARE NOT PATENT INELIGIBLE........................... 2

    A.  The '160 Patent ........................................................................................ 2

    B.  The '160 Patent's Asserted Claims........................................................... 3

    C.  Argument .................................................................................................. 4

        1.  The Asserted Claims Are Directed To An Abstract Idea. ........................ 4

        2.  The Asserted Claims Lack An Inventive Concept..................................... 9

IV.  THE '902 PATENT'S CLAIMS ARE NOT PATENT INELIGIBLE........................... 11

    A.  The '902 Patent ...................................................................................... 11

    B.  The '902 Patent's Asserted Claims......................................................... 12

    C.  Argument ................................................................................................ 13

        1.  The Asserted Claims Are Directed To An Abstract Idea. ...................... 13

        2.  The Asserted Claims Lack An Inventive Concept................................... 16

V.  THE '702 PATENT'S CLAIMS ARE NOT PATENT INELIGIBLE........................... 17

    A.  The '702 Patent ...................................................................................... 17

    B.  The '702 Patent's Asserted Claims......................................................... 18

    C.  Argument ................................................................................................ 19

        1.  The Asserted Claims Are Directed To An Abstract Idea. ...................... 19

        2.  The Asserted Claims Lack An Inventive Concept................................... 24

VI.  CONCLUSION............................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affinity Labs of Texas, LLC v. DIRECTV, LLC,*
    838 F.3d 1253 (Fed. Cir. 2016)................................................................20

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l,*
    573 U.S. 208 (2014).................................................................... *passim*

*Apple, Inc. v. Ameranth, Inc.,*
    842 F.3d 1229 (Fed. Cir. 2016)......................................................7, 15, 21

*In re Bd. of Trustees of Leland Stanford Junior Univ.,*
    991 F.3d 1245 (Fed. Cir. 2021)......................................................... *passim*

*Braemar Mfrs., LLC v. ScottCare Corp.,*
    816 F. App'x 465 (Fed. Cir. 2020) ............................................................21

*BSG Tech LLC v. Buyseasons, Inc.,*
    899 F.3d 1281 (Fed. Cir. 2018)..............................................................9, 25

*Elec. Power Grp., LLC v. Alstom S.A.,*
    830 F.3d 1350 (Fed. Cir. 2016).....................................................4, 7, 10, 15

*Enco Sys., Inc. v. DaVincia, LLC,*
    845 F. App'x 953 (Fed. Cir. 2021) ...............................................4, 13, 19

*FairWarning IP, LLC v. Iatric Sys., Inc.,*
    839 F.3d 1089 (Fed. Cir. 2016)......................................................7, 15, 22

*In re Gale,*
    856 F. App'x 887 (Fed. Cir. 2021) ............................................................7

*iLife Techs., Inc. v. Nintendo of Am., Inc.,*
    839 F. App'x 534 (Fed. Cir. 2021) .............................................9, 16, 24

*Intellectual Ventures I LLC v. Capitol One Bank (USA),*
    792 F.3d 1363 (Fed. Cir. 2015)..............................................................11

*Intellectual Ventures v. Capital One Financial Corp.,*
    850 F.3d 1332 (Fed. Cir. 2017).............................................................15

*Parker v. Flook,*
    437 U.S. 584 (1978)...................................................................6, 8, 11, 15

*PersonalWeb Techs. LLC v. Google LLC*,
    8 F.4th 1310 (Fed. Cir. 2021) ..................................................................6, 7, 8, 14

*SAP Am., Inc. v. InvestPic, LLC*,
    898 F.3d 1161 (Fed. Cir. 2018)............................................................. *passim*

*TDE Petroleum Data Sols., Inc. v. AKM Enters., Inc.*,
    657 F. App'x 991 (Fed. Cir. 2016) .................................................................21

*In re TLI Commc'ns LLC Patent Litig.*,
    823 F.3d 607 (Fed. Cir. 2016)..........................................................11, 16, 21, 25

*Universal Secure Registry LLC v. Apple Inc.*,
    10 F.4th 1342 (Fed. Cir. 2021) ............................................................. *passim*

*WhitServe LLC v. Dropbox, Inc.*,
    854 F. App'x 367 (Fed. Cir. 2021) .................................................................20

**LIST OF EXHIBITS**

| Decl. Ex. | Document Name | Abbreviation |
|---|---|---|
| Ex. A | U.S. Patent No. 7,366,160 | '160 Patent |
| Ex. B | Response to February 12, 2007 Office Action (June 12, 2007) | Resp. to 1st Office Action |
| Ex. C | Response to July 19, 2007 Office Action (Nov. 19, 2007) | Resp. to 2d Office Action |
| Ex. D | Excerpts of the Expert Report of Mark Coates Ph.D. Regarding the Invalidity of U.S. Patent Nos. 7,366,160 (Feb. 1, 2022) | Coates 160 Invalid. Rept. |
| Ex. E | Excerpts of the Expert Report of Dr. Stan McClellan - Infringement of U.S. Patent No. 7,366,160 By Microsoft Corporation (Feb. 1, 2022) | McClellan 160 Inf. Rept. |
| Ex. F | Excerpts of Patrol DashBoard User Guide Version 6.4 (Nov. 1, 2001) | Patrol Dashboard Guide |
| Ex. G | U.S. Patent No. 8,274,902 | '902 Patent |
| Ex. H | U.S. Patent No. 7,106,702 | '702 Patent |
| Ex. I | Excerpts of the Opening Expert Report of Alan DeKok (Feb. 1, 2022) | DeKok Op. Rept. |
| Ex. J | Excerpts of the Expert Report of Dr. Stan McClellan - Infringement of U.S. Patent No. 7,106,702 by Microsoft Corporation (Feb. 1, 2022) | McClellan 702 Inf. Rept. |
| Ex. K | Excerpts of the Expert Report of Dr. Stan McClellan Regarding Validity of U.S. Patent 7,106,702 (Mar. 1, 2022) | McClellan 702 Valid. Rept. |
| Ex. L | Excerpts of the Testimony of Stan McClellan Ph.D. (Mar. 31, 2022) | McClellan Dep. |

I.       **INTRODUCTION**

The asserted claims of U.S. Patent No. 7,366,160 (the "'160 Patent"), U.S. Patent No. 8,274,902 (the "'902 Patent") and U.S. Patent No. 7,106,702 (the "'702 Patent") are directed to unpatentable subject matter.  In the **'160 Patent** and **'902 Patent**, the asserted claims are directed to nothing more than data collection and manipulation through the application of math.  Namely, the '160 Patent claims using a mathematically-determined "trend" to predict future values, while the '902 Patent uses collected data to "estimate" data losses in a network.

Beyond the application of abstract mathematical concepts to collected data, the asserted claims require no more than generic computing functions or components, additional mathematical formulae, or post-solution applications of these mathematical formulae.  For example, in the '160 Patent, the sole independent claim describes generically "selecting," "measuring," or "determining" data (such as parameters), values, or "trends."  And the independent claims in the '902 Patent recite limitations that require no more than "collecting" and "estimating" information on data losses (which the patent admits was known in the prior art).

The asserted claims in the **'702 Patent** are directed to improving network reliability using redundancy—specifically, by activating a back-up server if an active server fails.  The central concept is nothing more than providing redundancy to ensure that critical functionality can continue to be offered if the function-providing component becomes unavailable.  The notion that redundant capacity is desirable for essential function is the epitome of an abstract idea. Indeed, it is implemented in decades-old contexts—mothballed power generating plants that can be brought on-line or back-up generators for homes, businesses, or hospitals.  Neither the claims nor the written description adds anything to this common-sense, abstract concept.

And while the '702 claims limit application of this back-up capacity concept to particular functions—Authentication, Authorization, and Accounting (AAA)—in a particular technological

setting—wireless communications networks—abstract concepts do not become patent-eligible merely because a patent claims their use only in certain defined areas.  Here, the '702 Patent does not describe or claim any new hardware or software and makes clear that the claimed methods can be carried out using conventional equipment in a conventional way.

This Court should therefore enter judgment for Microsoft because the asserted claims of the '160 Patent, '902 Patent, and '702 Patent fail the two-step *Alice* test.

## II.     LEGAL STANDARD

The Patent Act provides protection for a broad range of inventions, but it "contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable."  *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (citation omitted). As this Court knows, the Supreme Court in *Alice* established a two-part test to determine whether this exception applies: first, is a patent claim directed to ineligible subject matter, such as an abstract idea; and, second, if so, does the claim contain an "inventive concept" that makes it something other than a claim to the ineligible matter itself.  *Id.* at 217-18.

## III.    THE '160 PATENT'S CLAIMS ARE NOT PATENT INELIGIBLE

### A.     The '160 Patent

The '160 Patent, titled "Method of Determining Service Trends," describes and claims just that—a method of mathematically determining a "trend."  ('160 Patent, Title.)  The claimed method requires a user to perform the steps of measuring data about a network service, determining the value of an "indicator" based on that data, calculating a "trend" of the "indicator," and using the "trend" to determine a time of the "indicator" crossing a threshold. (*Id.*, Claim 1.)  The patent states, by using the claimed method, a user can "forecast[] accurately" when a network service will fail.  (*Id.*, 1:24-32.)  However, the '160 Patent's claims do not require the use or application of data obtained from practicing the claimed steps; rather, the

claims are limited to analyzing data using mathematics.  For example, the claims do not require any action even if a user predicts that an indicator will cross a threshold.  (*See id.*, Claim 1.)

During the prosecution of the '160 Patent, the patentee affirmatively stated that virtually all of the steps in Claim 1 (the only independent claim) were conventional.  (*See* Resp. to 1st Office Action, 6; Resp. to 2d Office Action, 3.)  According to the patentee, the difference between the claimed method and prior art was the use of a calculated "trend" to predict when a threshold will be crossed.  (*See* Resp. to 2d Office Action, 3-4; Resp. to 1st Office Action, 6-7.) Such mathematical calculations, however, have long been used in a variety of fields.  Scientists and engineers have mathematically determined "trends," and used them for prediction and data analysis, since long before the '160 Patent was filed.  (Coates 160 Invalid. Rept., ¶¶460-61, 464.)

### B.     The '160 Patent's Asserted Claims

WSOU has asserted Claims 1, 2, 4, 5, 10, 11, and 12 of the '160 Patent.  **Claim 1**, the only independent claim, recites:

**1.**   A method of determining communications network service trends, the method comprising the steps of:

selecting two or more parameters of a network representative of a network service and variable in time;

measuring and/or calculating at two or more times values of the network parameters;

determining at two or more times the value of a service indicator as a function of said measured and/or calculated parameter values;

determining a trend of the indicator as a function of said determined indicator values, and determining as a function of the trend of the indicator a time of the service indicator crossing a defined threshold.

('160 Patent, Claim 1.)  In its *Markman* order, the Court held that each of the various disputed claim terms should be given its plain and ordinary meaning.  (Dkt. 62, at 4-5.)[1]

## C.    Argument

### 1.    *The Asserted Claims Are Directed To An Abstract Idea.*

"Under the first step of the *Alice* framework," courts consider "what the patent asserts to be the 'focus of the claimed advance over the prior art.'"  *Enco Sys., Inc. v. DaVincia, LLC*, 845 F. App'x 953, 957 (Fed. Cir. 2021) (quoting *Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161, 1168 (Fed. Cir. 2019)).  The claims of the '160 Patent focus on the use of a mathematically-determined "trend" for prediction without more.  These claims are therefore directed to abstract "mathematical calculations," "mathematical algorithms for performing calculations," *In re Bd. of Trustees of Leland Stanford Junior Univ.*, 991 F.3d 1245, 1250 (Fed. Cir. 2021), and data analysis, *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353-54 (Fed. Cir. 2016).

The '160 Patent explains that the problem in the prior art was the absence of "a trend *calculation*"—that is, the patent alleges that the prior art lacked a way to *calculate* "the variation over time of the monitored indicator," ('160 Patent, 1:16-19 (emphasis added)), and therefore did not allow for "forecasting accurately the failure of a network service" (*id.* at 1:24-25).  The patent purports to solve this problem by using a mathematically-determined "trend" to predict when an indicator will cross a defined threshold.  (*See id.* at 2:15-19 ("Thus the invention indicates a trend of the measured indicator . . . . The trend can show when the indicator is likely to cross a defined threshold or even determine when it will cross the threshold.").)

---

[1] With respect to one term—"service indicator"—the Court articulated the plain and ordinary meaning, holding that it is "an indicator of the quality of a network service."  (Dkt. 62, at 4-5.)

With respect to **Claim 1**, the only independent claim, the only claim limitation that the patentee maintained was novel during prosecution was the "step of *determining as a function* of the trend of the indicator a time of the service indicator crossing a defined threshold"[2]—a mathematical operation. The patent confirms that this step reflects a mathematical operation by describing the calculation of trends using well-known mathematical tools for determining, for example, the slope of a line. (*See, e.g.*, *id.*, 4:60-61 (stating "[a] trend having a high slope may be synonymous with imminent failure of the network service"); 4:20-23 (describing the use of "linear regression"[3] to obtain an indicator plane).)

The other elements of Claim 1—(1) "selecting two or more parameters," (2) "measuring and/or calculating" the values of the parameters at multiple times, (3) "determining" a "service indicator" based on the parameter values, and (4) a "threshold"—are both abstract and conventional. Selecting, measuring, and analyzing data is an abstract idea. *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018). And, as the patentee admitted, these elements were well known. (Resp. to 1st Office Action, 6-7; Resp. to 2d Office Action, 3; *see also* Coates 160 Invalid. Rept., ¶¶460-62.)

A claim directed to a result that is itself an abstract idea—like calculating a trend and using it to predict a future value—and uses only generic processes and devices to provide that result is an ineligible abstract idea. *Universal Secure Registry LLC v. Apple Inc.*, 10 F.4th 1342, 1356-57 (Fed. Cir. 2021). Using a trend to predict when an indicator value will exceed or fall below a threshold simply describes using mathematics to predict when one value will be less than, or greater than, another value. A process that starts with data, applies an algorithm to it,

---

[2] Resp. to 1st Office Action, 6-7; Resp. to 2d Office Action, 3-4.
[3] Linear regression is itself a mathematical concept that was well known (a "classical approach") long before the '160 Patent. (Coates 160 Invalid. Rept., ¶461.)

and ends up with a new form of data is "directed to an abstract idea." *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1317 (Fed. Cir. 2021) (quoting *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017)).  Indeed, WSOU's technical expert, Dr. Stan McClellan, opined that the '160 Patent was directed at "the use of collected telemetry data ('network parameters') in *determining inferences and trends related to abstract functions* of the data ('service indicators')."  (McClellan 160 Inf. Rept., ¶25 (emphasis added).)

That claims like these asserted claims are patent-ineligible has been settled for decades. In *Parker v. Flook*, the Supreme Court held that a method of updating "alarm limits" for use in a catalytic conversion process was abstract.  437 U.S. 584, 594-95 (1978).  There, the claimed method "consist[ed] of three steps: an initial step which merely measure[d] the present value of the process variable (*e.g.*, the temperature); an intermediate step which use[d] an algorithm to calculate an updated alarm-limit value; and a final step in which the actual alarm limit [wa]s adjusted to the updated value."  *Id.* at 585.  The only difference between conventional methods of updating alarm limits and the claimed method was "in the second step—the mathematical algorithm or formula."  *Id.* at 586.  The patent did not "purport to explain how to select" variables or "contain any disclosure relating to the chemical processes at work, the monitoring of process variables, or the means of setting off an alarm or adjusting an alarm system."  *Id.*

Here, the patent also does not provide a method for selecting "parameters" or determining "indicator" values, or disclose anything relating to the technological processes for monitoring parameters or determining indicator values.  The claimed innovation is only the use of a mathematically-determined trend for predicting a future value.  Indeed, like the claims in *Parker*, the methods of Claim 1 and the dependent claims can be performed by a human using pencil and paper, with no need for any physical devices, conventional or otherwise.  *See Parker*, 437 U.S. at

586.  As Dr. McClellan noted "measuring and calculating is essentially collecting of data."
(McClellan Dep., 137:22-138:8.)  Collecting data is something that can be implemented with a
pad of paper (or even solely inside the human mind).

The Federal Circuit recently explained that it is "a telltale sign of abstraction" that a
process can be performed with pencil and paper.  *PersonalWeb*, 8 F.4th at 1316.  Moreover,
claiming a feature or function—such as the "selecting," "measuring," and "determining" steps of
the claims—but, as here, no specific way of providing or performing that feature or function is
an abstract idea.  *See Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1241 (Fed. Cir. 2016); *see
also SAP Am.*, 898 F.3d at 1167-68 (claiming a result and not a concrete way of achieving it is an
abstract idea).

The Federal Circuit has repeatedly held that claims like those in the '160 Patent are
abstract.  A method that involves "the selection and mathematical analysis of information" is
directed at an abstract idea.  *SAP Am.*, 898 F.3d at 1168.  The asserted claims in the '160 Patent
do exactly that.  The claims involve the admittedly routine steps of "selecting," "measuring," and
"determining" certain data related to a network service.  They then require a "mathematical
analysis" of that data to determine a trend and make a prediction using the trend.  *See also Elec.
Power Grp.*, 830 F.3d at 1351 ("[M]ethods for performing real-time performance monitoring of
an electric power grid by collecting data from multiple data sources, analyzing the data, and
displaying the results" were not patentable); *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d
1089, 1094 (Fed. Cir. 2016) (holding claims "directed to collecting and analyzing information to
detect misuse and notifying a user when misuse is detected" directed to "a combination of []
abstract-idea categories"); *In re Gale*, 856 F. App'x 887, 889 (Fed. Cir. 2021) ("Mr. Gale's
claims are directed to the abstract idea of (1) collecting information (here, receiving messages

and reading their metadata), (2) analyzing the information (here, calculating a usage pattern and
determining its compliance with a predetermined usage pattern), and (3) reporting the results.").

The remaining, dependent, claims are similarly abstract. **Claim 2** merely limits the
method to particular network services. ('160 Patent, Claim 2.) But limiting "a process of
collecting and analyzing information . . . to particular content or a particular source . . . does not
make the collection and analysis other than abstract." *SAP Am.*, 898 F.3d at 1168 (internal
quotation marks omitted).

**Claims 4** and **5** layer on additional mathematical operations related to comparing
"parameter values" or a "parameter trend" to a threshold. (*Id.*, Claims 4-5.) Claims that "only
further define the mathematical calculations recited" in the independent claim do not "transform
the abstract idea into a patent eligible application." *In re Bd. of Trustees*, 991 F.3d at 1252.

**Claims 10** and **11** merely provide for conventional post-solution applications of the
formula—"calculating a mathematical expectation of financial loss" and "determining a
capacity to provide a network service at a given time." (*Id.*, Claims 10-11.) The "identification
of a limited category of useful, though conventional, post-solution applications of [] a formula"
does not make a method eligible for patent protection. *Parker*, 437 U.S. at 585. Moreover, these
post-solution applications are simply additional calculations, which are themselves abstract.
Adding one abstract idea to another is still abstract. *See PersonalWeb*, 8 F.4th at 1318 (rejecting
claims to "a medley of mental processes that, taken together, amount only to a multistep mental
process").

And **Claim 12**—for a generic "network" or "system using a method according to claim
1"—is necessarily no less abstract than Claim 1. ('160 Patent, Claim 12.) *See Alice Corp.*, 573

U.S. at 226-27 ("system" claims that call for implementing a method using generic components are no less abstract than claims to the method).

Indeed, the results-based claiming in each of the asserted claims preempts swaths of the concept of collecting data, analyzing it for a trend, and using the trend for prediction, particularly under WSOU's understanding of the claims. As Dr. McClellan has opined: "[t]he asserted claims of the '160 patent cover the *entire concept* of collecting data as a means of inferring 'indicators' for a network which provides 'services.'" (McClellan 160 Inf. Rept., ¶28 (emphasis added).) Each of the '160 patent's asserted claims is therefore directed to an abstract idea.

        *2.    The Asserted Claims Lack An Inventive Concept.*

No "inventive concept" salvages the claims. To be saved under step two of *Alice*, additional elements recited in a claim must amount to "significantly more" than the abstract idea itself. *In re Bd. of Trustees*, 991 F.3d at 1250. The claim elements must "involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *iLife Techs., Inc. v. Nintendo of Am., Inc.*, 839 F. App'x 534, 537 (Fed. Cir. 2021); *Universal Secure Registry,* 10 F.4th, at 1346; *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290-91 (Fed. Cir. 2018).

As explained above, every claim in the '160 Patent is directed to an abstract idea. In **Claim 1**, nothing in the claims describes more than conventional, well-understood (and abstract) techniques used in a conventional way, as the patentee effectively admitted during the prosecution of the patent. (Resp. to 1st Office Action, 6-7; Resp. to 2d Office Action, 3-4; Coates 160 Invalid. Rept., ¶¶460-62.) The only distinction the patentee identified between the claimed invention and the prior art was the use of a mathematically-determined trend to predict a future value. But the '160 Patent does not describe any specific, technological processes for

determining a trend or making a prediction; it simply employs well-known mathematical

concepts to perform calculations.  (*Id.*, ¶¶ 460-62.)

The patent admits that the prior art determined trends, and that same prior art confirms

that those trends were used to predict when a threshold would be crossed.  (*See* '160 Patent,

1:10-13 ("BMC Software's 'Patrol Dashboard' product uses a network monitoring method which

measures the bandwidth of a network at different times and determines a bandwidth trend as a

function of the measurements."); ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████  "There is, in short, nothing

'inventive' about any claim details, individually or in combination, that are not themselves in the

realm of abstract ideas."  *SAP Am.,* 898 F.3d at 1170.  The claims "do not even require a new

source or type of information, or new techniques for analyzing it."  *Elec. Power Grp.,* 830 F.3d

at 1355.  "As a result, they do not require an arguably inventive set of components or methods,

such as measurement devices or techniques, that would generate new data." *Id.*

Limiting the application of mathematical principles to a "particular field of information,"

as **Claim 2** does, can no more "move the claims out of the realm of abstract ideas" at *Alice* step

two than it can at step one. !*SAP Am.,* 898 F.3d at 1169.  And features like those in **Claims 4** and

**5** "simply provide further narrowing of what are still mathematical operations," "add nothing

outside the abstract realm," and cannot provide an "inventive concept."  *Id.*

The additional calculations required in **Claims 10** and **11**—themselves abstract ideas as

explained above—cannot provide an "inventive concept."  Nor does **Claim 12**'s rote recital of a

"network and/or service management system" using Claim 1's method add any inventive concept

to the claims.  It recites no novel (or any) hardware or software making up the "network" or "system" and does nothing more than add a generic context or setting for the abstract idea, which is not sufficient.  The collection of data for use in mathematical processes in a generic "network" or "system" does not create a special-purpose machine.  *See Alice Corp.*, 573 U.S. at 226-27 (claim to "system" for implementing the abstract idea with generic components is likewise abstract and unpatentable); *see also In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 613-14 (Fed. Cir. 2016) (recitation of physical components that provide a generic environment in which to carry out the abstract idea is not sufficient); *Intellectual Ventures I LLC v. Capitol One Bank (USA)*, 792 F.3d 1363, 1366 (Fed. Cir. 2015) (limiting invention to a particular technological environment, like the Internet, is not sufficient).

Moreover, while it does not matter whether the mathematics involved are new or innovative (*Parker*, 437 U.S. at 591), it is notable here how basic the claimed concepts are.  *See In re Bd. of Trustees*, 991 F.3d at 1252 (noting "[t]he written description further illustrates that the mathematical steps performed and the data received are conventional and well understood in the prior art").  Calculating a trend from data and using that trend to predict a future value is no more than a basic statistics tool.  (*See* Coates 160 Invalid. Rept., ¶¶460-61, 64.)

The claims of the '160 patent are directed to an abstract idea and contain no inventive concept. They are unpatentable under section 101.

## IV.   THE '902 PATENT'S CLAIMS ARE NOT PATENT INELIGIBLE

### A.   The '902 Patent

The '902 Patent explains that to optimize a network's performance, a network operator benefits from having "information about packet losses on various links of the network."  ('902

Patent, 1:12-15.)[4]  A network operator armed with this information, for example, can identify and address an overloaded node on a network.  (*See id.*, 1:16-21.)  The patent goes on to state that the risk of overloaded nodes is especially high on 3G and 4G wireless networks.  (*Id.*, 1:22-23.)  And while it would be helpful to monitor most, or all, of the links on such networks for packet losses, to do so on such advanced wireless networks "would require a monitoring device to be deployed on each of the links that are to be monitored." (*Id.*, 1:38-40.)  According to the patent, this is typically not feasible given the large number of links.  (*Id.*, 1:40-44.)

The patent's proposed solution to this problem is embodied in Claims 1 and 6, the two independent claims.  The method involves collecting data on packet losses between a single collection point and the very end of the network (end-to-end) and using that data to estimate the packet loss rate on the increments that make up the end-to-end path.  (*See id.*, Claims 1 & 6.)

**B.      The '902 Patent's Asserted Claims**

WSOU has asserted Claims 1, 2, and 6.  **Claim 1** is an independent claim and recites:

**1.**  A method, comprising:

collecting data on downstream packet losses at a single collection point in a network that branches, downstream of the collection point, toward a plurality of end nodes and that includes nodes intermediate the collection point and at least some of the end nodes, wherein the data describe downstream end-to-end packet loss between the collection point and two or more end nodes on different branches of the network; and

from the collected data, estimating a packet loss rate on at least one path that begins or ends on an intermediate node and that includes or begins or ends on an intermediate node that is a branch point of the network.

---

[4] "Packet losses" describe when data "packets" are lost in transmission due to, for example, memory overflows on nodes that route the packets.  (*See* '902 Patent, 1:15-16, 3:38-42.)

('902 Patent, 8:12-24.)  Claim 1 does not require that packet loss data be collected using any particular technique or device.  Indeed, the claim's data collection and estimation steps can be performed by an individual using pencil and paper.

Claim 6 is the patent's other independent claim, and is Claim 1 in device form.  The Claim 6 device has two components: a generic "input" that performs the "collecting" step of Claim 1, and "a circuit configured to compute" the "estimating a packet loss" step of Claim 1.  No particular software or other configuration parameters are required by the claim.

C.     Argument

1.     *The Asserted Claims Are Directed To An Abstract Idea.*

"Under the first step of the *Alice* framework," courts consider "what the patent asserts to be the 'focus of the claimed advance over the prior art.'"  *Enco Sys.*, 845 F. App'x at 957 (quoting *Solutran*, 931 F.3d at 1168).

As explained above, the advance claimed by the '902 Patent is a solution to the supposed prior art problem that, although a network operator would benefit from having packet loss data on each link in a network, the operator typically could not install devices to monitor packet losses on all of the network's links.  ('902 Patent, 1:40-44.)  The patent proposes a solution for networks where data flows "downstream"—that is, where data flows from a root node, through "intermediate nodes," to "end nodes."  (*See id.*, 2:24-30; Claims 1 & 6 (requiring "data on downstream packet losses").)  The patent teaches using "a single collection point" to collect packet loss data from a root node to the "end nodes" (end-to-end), and using that data to "estimat[e] a packet loss rate" on a path that is an increment of the end-to-end path.  (*Id.*, Claims 1 & 6.)  The patent describes two estimation algorithms (*id.*, 5:28-30)—mathematical formulae—but the specification states that these algorithms are merely illustrative (*id.*, 4:67-5:2), and the claims do not require the use of either one for any estimation or calculation procedure.

13

The asserted claims of the '902 Patent are directed to the abstract idea of using an algorithm—any algorithm—to estimate packet loss rates.  Step one of **Claim 1** requires the conventional act of "collecting data on downstream packet losses at a single collection point" on a conventional network that contains nodes ("intermediate nodes") between the collection point and "end nodes."  ('902 Patent, Claim 1.)  The specification confirms this is conventional.  It identifies "well known" prior art devices that collect end-to-end packet loss data (*id.*, 2:55-59, 3:45-52), and identifies the types of known networks covered by Claim 1.  For example, Figure 1 (labeled Prior Art) shows a network covered by the claims, with branch points as "intermediate nodes" (e.g., SGSN, RNC, BS)[5] between a root node (GGSN) and downstream "end nodes" (the mobile devices).  The patent explains that a "well known" monitoring device can be installed on this type of network.  (*Id.*, 2:52-59, 3:52-57, Fig. 2.)

Step two of Claim 1 requires "estimating a packet loss rate" on a path that is an increment of the end-to-end path as long as the path "begins or ends" on an "intermediate node" and "includes" an "intermediate node that is a branch point."  As is true of any computational technique, the claimed method can be deployed on a general purpose computer running software or on a dedicated device that is hard-wired for the method or operating pursuant to firmware; the software, firmware, and hardware are referenced in purely generic terms.  ('902 Patent, 2:42-48.)  Indeed, claim 1 does not require that the method be performed using any device at all, conventional or otherwise—the data collection and estimation computation can be done using pencil and paper.  As the Federal Circuit recently explained, it is "a telltale sign of abstraction" that a process can be performed with pencil and paper.  *PersonalWeb*, 8 F.4th at 1316.

---

[5] These acronyms describe various components in the prior art cellular network of Figure 1. ('902 Patent, 2:22-30.)

Moreover, although even a novel algorithm or calculation method would be abstract and unpatentable, *see Parker*, 437 U.S. at 590 (explaining "that an algorithm, or mathematical formula, is like a law of nature"), the '902 Patent does not even require a specific algorithm or configuration of computing elements to perform its estimation step.  Claims that call for a step or result but do not describe any particular technical way of performing the step or providing the result claim only an abstract idea.  *See Ameranth, Inc*., 842 F.3d at 1241 (claiming a feature or function but not a specific way of providing or performing that feature or function is an abstract idea); *SAP*, 898 F.3d at 1167-68 (claiming a result and not a concrete way of achieving it is an abstract idea).  Furthermore, that Claim 1 does not even require a specific algorithm facially implicates the "the preemption concern that undergirds" the Supreme Court's section 101 jurisprudence.  *Alice*, 573 U.S. at 223.  As WSOU's technical expert confirmed, Claim 1 covers any algorithm for estimating a packet loss rate.  (McClellan Dep., 196:11-197:5.)

Beyond that, Claim 1's two steps, "collecting" packet loss data and "estimating" a packet loss rate from that collected data, describe nothing more than collecting data using any method whatsoever, analyzing it using mathematical techniques, and reporting the results.  Collecting, displaying, and manipulating data is an abstract idea.  *Intellectual Ventures v. Capital One Financial Corp.*, 850 F.3d 1332, 1340 (Fed. Cir. 2017).  These types of claims have consistently been found directed to abstract, unpatentable idea.  *See SAP Am.*, 898 F.3d at 1167-68; *Elec. Power Grp.*, 830 F.3d at 1354; *FairWarning*, 839 F.3d at 1093-94.  Claim 1 requires nothing more than this and so claims only an abstract, unpatentable idea.

The remaining asserted claims, **Claims 2** and **6**, impose generic device limitations on the method of Claim 1.  Claim 2 depends on Claim 1 and describes collecting "packet loss" data using a "dedicated hardware monitoring device," as was known in the prior art.  (*See* '902

Patent, 3:45-52 (describing a prior art Alcatel Lucent device that collects packet loss data).)

Claim 6 is an independent claim that implements the method of Claim 1 on a device. It claims a

generic "monitoring device comprising" an "input" for collecting the data required by Claim 1

and "a circuit configured to" make the computation required by Claim 1. Neither Claim 2 nor

Claim 6 describes any programming or design that will enable the device to produce the

"estimation." Implementing an abstract idea on conventional computer components does not

make the idea patent eligible. The claim must involve more than performing well-understood,

routine, conventional activities previously known in the field. *TLI*, 823 F.3d at 613; *see also*

*Universal Secure Registry*, 10 F.4th at 1357 (claim to multi-factor authentication was directed to

an abstract idea because it "merely combine[d] conventional techniques . . . to achieve an

expected cumulative higher degree of authentication integrity."). The '902 Patent's asserted

claims involve nothing more. The claims are thus directed to the abstract idea of using a

mathematical algorithm for estimation.

### 2.    *The Asserted Claims Lack An Inventive Concept.*

No "inventive concept" salvages the claims. To be saved under step two of *Alice*,

additional elements recited in a claim must amount to "significantly more" than the abstract idea

itself. *In re Bd. of Trustees*, 991 F.3d at 1250. The claim elements must "involve more than

performance of 'well-understood, routine, [and] conventional activities previously known to the

industry.'" *iLife*, 839 F. App'x at 537; *Universal Secure Registry,* 10 F.4th at 1346.

As explained above, devices for collecting packet loss data were known in the art, and the

networks covered by **Claim 1** likewise were known in the art. These limitations thus recite

conventional components and techniques organized and used in a conventional manner—

namely, using known devices for collecting packet loss data on a conventional network where

there may be packet losses. The advancement of the prior art in Claim 1 is that the claim recites

obtaining "estimated" packet loss rates on links that are not directly monitored.  However, Claim

1 does not describe how to perform this estimation or any configuration of components or

devices for performing this estimation, and the patent makes clear that "the precise process steps

are subject to numerous variations" and that the two algorithms described in the specification are

"merely illustrative."  ('902 Patent, 4:15-18, 4:67-5:2.)  Techniques for estimating packet losses

were known in the prior art, as WSOU's expert explained (McClellan Dep., 190:7-13), and

nothing in the claims adds any non-abstract component to those known techniques.

Claims 2 and 6 add nothing inventive to the method of Claim 1.  Each recites known,

generic hardware components such as a "dedicated hardware monitoring device," an "input," or

a "circuit" configured to perform calculation.  As the patent admits, "[m]onitoring devices that

can gather information from diverted packets and have the necessary computational power to

support implementation of our method are *well known and need not be described here in detail*."

('902 Patent, 2:55-59 (emphasis added).)

The asserted claims of the '902 Patent do not require anything other than achieving a

result (an estimate of packet losses), on a conventional network, using any mathematical

algorithm and generic computing components configured in an unspecified way to produce the

result.  The claims are directed to nothing more than an abstract idea and are not patent eligible.

## V.    THE '702 PATENT'S CLAIMS ARE NOT PATENT INELIGIBLE

### A.    The '702 Patent

The '702 Patent's claims are directed to the abstract idea of activating a back-up system

to perform AAA functions in a wireless network.  The '702 Patent explains that devices that

performed AAA functions in wireless networks were known in the prior art.  ('702 Patent, 1:17-

21.)  AAA functions themselves are straightforward and were well-known: authentication

verifies a user's identity; authorization determines whether a user can access a network resource; and accounting collects user data.  (DeKok Op. Rept., ¶93; McClellan 702 Inf. Rept., ¶27.)

The '702 Patent further admits that using back-up devices on a network was known in the prior art, and was known to improve the availability of AAA resources.  The patent states that as a general matter "it is desirable to have redundancy . . . so that one or more back-ups may take over when functions and/or resources are lost due to failure or otherwise."  ('702 Patent, 1:23-26.)  As the patent notes, for AAA functions in particular, it is undesirable to have only one node "capable of AAA functionality and/or be the sole location for maintenance of the user database" because "the destruction of [the] node or its separation from the network would undesirably disrupt the entire network."  (*Id.* 1:31-35.)  The patent notes that a known solution to this problem was to "have every node in the network carry out AAA functions and distribute a duplicate copy of the user database to every node" but suggests that this results in inefficiencies because all of the nodes will need to stay synchronized with each other.  (*Id.* 1:40-50.)  To avoid this inefficiency, the patent proposes selecting only *some* AAA nodes to be active and then activating a back-up AAA node if one of the active nodes is disconnected from the network.  (*Id.* 1:51-2:2.)  As explained below, this approach is nothing more than the application of an abstract idea in the context of a wireless communications network.

### B.    The '702 Patent's Asserted Claims

WSOU has asserted Claims 1, 3, 8, 10-12, and 16-17 of the '702 Patent.  Claim 1 and Claim 11 are the only independent claims.  **Claim 1** recites:

1.   A method of maintaining authentication, authorization and accounting (AAA) functionality for a wireless communications network having a plurality of nodes which are AAA function capable, said method comprising:

(a) selecting two of the plurality of nodes to be active nodes;

18

(b) activating the AAA functions of the active nodes;

(c) monitoring the active nodes to determine if one of the active nodes gets disconnected from the network;

(d) if one of the active nodes gets disconnected from the network; selecting another of the plurality of nodes to become an active node;

(e) activating the AAA functions of the node selected in step (d); and,

(f) informing the plurality of nodes that the node selected in step (d) has its AAA functions activated.

('702 Patent, Claim 1.)

**Claim 11** recites:

**11.** A wireless communication network comprising:

a plurality of nodes, each node being initially provisioned with a user database and equipped to carry out authentication, authorization and accounting (AAA) functions for the network by employing their respective user database, said plurality of nodes including:

a subset thereof which are active nodes that in fact carry out the AAA functions for the network by employing their respective user databases, said active nodes monitoring one another to detect if an active node becomes disconnected from the network, wherein when one is determined to be disconnected from the network another of the plurality of nodes is selected to be an active node and the network informed thereof.

('702 Patent, Claim 11.)

**C.    Argument**

> *1.    The Asserted Claims Are Directed To An Abstract Idea.*

"Under the first step of the *Alice* framework," courts consider "what the patent asserts to be the 'focus of the claimed advance over the prior art.'" *Enco Sys.*, 845 F. App'x at 957 (quoting *Solutran*, 931 F.3d at 1168).  The '702 Patent alleges that its advance over the prior art is selecting only *some* nodes to be active rather than *all* nodes, monitoring those active nodes, and then activating a back-up node should one of the active nodes be disconnected.  ('702 Patent,

1:51-2:2.)  This purported advance is nothing more than a conventional and routine practice. Humans have long employed back-up systems that, for the sake of efficiency, are activated only when needed; indeed, it is routine when using back-ups (generators, sump-pumps, players on the bench) to monitor the active systems and *not* to activate back-ups until a failure occurs.

Neither the claims nor the written description adds anything to the common-sense, abstract idea of employing a back-up mechanism for important functions when needed.  The claims are limited to AAA functions in wireless communications networks, but abstract concepts do not become patent-eligible merely because a patent claims their use only in certain contexts. *See Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1259 (Fed. Cir. 2016). Although WSOU's expert asserts the '702 Patent provides "a specific solution to a technological problem" that "does not have an analog in the context of economic or human activity," he offers nothing more than *ipse dixit* that this is the case, and fails to point to anything suggesting that using back-ups to ensure system availability is somehow different or special in the wireless network or AAA context.  (*See, e.g.*, McClellan 702 Valid. Rept., ¶¶244-254.)  To the contrary, providing back-up capability in the information technology context is an entirely conventional, abstract concept.  *See, e.g., WhitServe LLC v. Dropbox, Inc.*, 854 F. App'x 367, 372 (Fed. Cir. 2021) (maintaining back-up data records is an abstract idea).

The '702 Patent also does not describe or claim any new hardware or software, and makes clear that the claimed methods can be carried out using conventional equipment in a conventional way.  To the extent the patent references specific physical components at all, in claim 12, it acknowledges that those components—mobile switching centers, visitor location registers, *etc.*—"may be of any appropriate kind known in the art."  ('702 Patent, 3:2-7.)  The patent does not suggest that any of these conventional components is used in an unconventional

way or produces any unconventional result.  The mere recitation of tangible components is not

sufficient to make an abstract idea patentable; the components must involve more than

performance of well-understood, routine, conventional activities previously known in the field.

*TLI*, 823 F.3d at 611-12; *see also Universal Secure Registry*, 10 F.4th at 1357 (claim to multi-

factor authentication was directed to an abstract idea because it "merely combine[d] conventional

techniques . . . to achieve an expected cumulative higher degree of authentication integrity").

The components identified in the '702 Patent's claims involve nothing more.

 Analysis of the individual claims confirms that the purported invention is nothing more

than the application of the abstract idea of activating a back-up in a particular technological

setting and thus not patent-eligible.  Independent **Claim 1** sets out the basic, six-step method for

maintaining AAA functionality in a wireless network.  <u>Step one</u> is to select two network nodes to

be AAA-active.  The Background of the Invention recites that it was known to have networks

with a plurality of nodes performing AAA functions, *i.e.*, active nodes.  ('702 Patent, 1:40-50.)

Selecting a subset of such nodes, without specifying any mechanism or technique for making the

selection, is an abstract idea.  *See Ameranth*, 842 F.3d at 1241 (claiming a feature or function but

not a specific way of providing or performing that feature or function is an abstract idea).  <u>Step</u>

<u>two</u> calls for activating the AAA functionality in the selected nodes.  Activating nodes selected

to be active is purely abstract.  Again, the acknowledged prior art provided for AAA-active

nodes, and the patent does not recite any mechanism for achieving activation; it claims only the

result, and that is an abstract idea.  *See id.*  <u>Step three</u> is to monitor the active nodes to determine

if one gets disconnected.  To "monitor" is an abstract concept, *see TDE Petroleum Data Sols.,*

*Inc. v. AKM Enters., Inc.*, 657 F. App'x 991, 993 (Fed. Cir. 2016) (monitoring to collect

information is an abstract idea); *Braemar Mfrs., LLC v. ScottCare Corp.*, 816 F. App'x 465, 469-

70 (Fed. Cir. 2020) (same), and the patent claims no particular mechanism or technique for accomplishing the claimed monitoring.  Steps four and five require that if an active node is disconnected, another node is selected to become an active node and its AAA functionality is activated.  As with steps one and two, selection and activation are abstract concepts, and the patent claims only the results, not any mechanism or technique for achieving them.  Finally, step six calls for informing the other nodes that the newly-selected node is AAA-active. Communicating information is an abstract concept, *see, e.g., SAP*, 898 F.3d at 1167-68; *FairWarning*, 839 F.3d at 1093, and the patent specifies no mechanism for performing this function.  Claim 1's combination of abstract concepts and results-based claiming implicates "the preemption concern that undergirds" the Supreme Court's section 101 jurisprudence, resulting in broad claims that would preempt the implementation of the abstract concepts in the context of AAA systems.  *Alice*, 573 U.S. at 223.  As Dr. McClellan opined, "[t]he asserted claims of the '702 patent cover the *entire concept* of monitoring and synchronizing a distributed AAA capability in a communication network."  (McClellan 702 Inf. Rept., ¶31 (emphasis added).)

Claims that depend on claim 1 add nothing concrete or innovative.  **Claim 3** provides that each active node monitors the status of the other—again, no particular mechanism or structure for accomplishing the monitoring is required, and the '702 Patent makes clear that in prior art networks all active nodes could communicate with all others.  ('702 Patent, 1:40-43.)  **Claim 8** provides that each node should include a copy of the user database used to carry out AAA functions.  As the patent explains in the Background of the Invention, "a user database is typically employed" to carry out AAA functions, so this is merely conventional and expected functionality for AAA systems.  (*Id.*, 1:17-22.)  The Background of the Invention likewise explains that where multiple nodes provide AAA functionality, changes to user databases of

AAA-active nodes must be communicated to user databases of other active nodes to maintain

synchronization (*id*., 1:45-49; *see also id*., 3:50-54), so **Claim 10** adds nothing inventive.

      **Claim 11** is an independent claim to a network having two components: (1) a plurality of

nodes provisioned with user databases and equipped to carry out AAA functions with those

databases, with (2) a subset of the nodes being active nodes that carry out AAA functions

pursuant to the method of claim 1.  As noted above, the patent recites that it was known to have a

network with a plurality of nodes capable of carrying out AAA functions and using their user

databases to do so.  (*Id*., 1:16-19, 1:40-43.)  The rest of the claim requires only that generic

components be configured in some unspecified way to perform the method of claim 1.  Claiming

generic components configured to carry out steps that are themselves abstract is not a patent-

eligible invention.  *See Alice*, 573 U.S. 208 at 226-27 ("system" claims that call for

implementing a method using generic components are no less abstract than the method itself).

Dependent **Claim 12** claims the claim 11 network with additional conventional components, all

of which "may be of any appropriate kind known in the art."  ('702 Patent, 3:1-6.)  Framing the

invention as a claim to a generic network that performs an abstract method of maintaining AAA

functions for a network, rather than as the abstract method itself, adds nothing of patentable

significance.  Dependent **Claim 16** limits the number of active nodes in the claim 11 network to

two.  That limitation adds nothing patentable: the patent acknowledges that it was known to have

only one active node and to have all nodes active (*id.*, 1:40-43) and selecting a number within

that range is an abstract idea; moreover, no technique or method for making the selection is

identified or claimed.  **Claim 17** provides that all nodes in the claim 11 network can

communicate with all others.  The patent recites that in a network where all nodes carry out AAA

functions, the nodes all communicate with each other.  (*Id.*, 1:40-50.)  The patent does not

identify any mechanism or technique for accomplishing the communication, so it adds nothing to the known, abstract concept of communication.  Each of the '702 Patent's claims is therefore directed to an abstract idea.

2.    <u>*The Asserted Claims Lack An Inventive Concept.*</u>

No "inventive concept" salvages the claims.  To be saved under step two of *Alice*, additional elements recited in a claim must amount to "significantly more" than the abstract idea itself.  *In re Bd. of Trustees*, 991 F.3d at 1250.  The claim elements must "involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'"  *iLife*, 839 F. App'x at 537; *Universal Secure Registry*, 10 F.4th at 1346.

As explained above, the act of "selecting" two active nodes (independent **Claim 1**) or deploying "a plurality of nodes . . . a subset thereof which are active nodes" (independent **Claim 11**) is a common-sense and routine implementation of the abstract idea of activating a back-up system when an active system goes offline.  This idea is the only difference between the admitted prior art system where all AAA nodes are active and the claimed system where only some AAA nodes are active.  ('702 Patent, 1:40-50.)  Nothing else in the claims adds anything other than conventional components and techniques organized in a conventional manner. Indeed, the "activating," "monitoring," "selecting," and "informing" steps in Claims 1 or 11 are entirely generic—no particular methods or mechanisms for performing those steps are claimed or described.  The patent notes that AAA-functional nodes with user databases existed in the prior art (*id.*, 1:16-22), and describes performing each of the "activating," "monitoring," "selecting," and "informing" steps in a generic way.  (*See, e.g.*, *id.*, 3:53-55 (stating simply that the "nodes also monitor one another"), 4:40-46 (stating simply that "the new node is identified").)

There is no indication anywhere in the specification that these are not routine computing functions, consistent with the opinion of Microsoft's technical expert, Mr. Alan DeKok.  (DeKok

24

Op. Rept., ¶¶664, 672.)  And, indeed, WSOU's expert agrees the concept of bringing a back-up server on-line was well-known: he explains a number of prior art references "teach the *standard use* of a primary server and a back-up server such that if the primary server is unavailable, the client uses the back-up server."  (McClellan 702 Valid. Rept., ¶73.)

As explained above, the claims that depend on Claim 1 add nothing inventive, reciting only conventional components and techniques or simply claiming the result of performing the abstract step or achieving the abstract result.  A claimed invention's use of the abstract idea to which it is directed does not supply the inventive concept required by step two of *Alice*.  *See BSG Tech*., 899 F.3d at 1290.  Likewise, the "wireless communication network" claims based on Claim 11 merely recite known components and techniques or abstract concepts with no specific method of implementing them, as explained above.  A recitation of tangible components is not sufficient to make a claim directed to an abstract idea patent-eligible.  *TLI*, 823 F.3d at 611-12.

Thus, the claims of the '702 Patent are directed to the abstract, conventional concept of providing back-up capability for important functions.  They apply that concept in a particular setting—AAA functionality in wireless communication networks—which does not make the concept patent-eligible, and they include no inventive concept, instead simply describing generic, conventional techniques and components deployed in a generic, conventional way. They are unpatentable under section 101.

**VI.    CONCLUSION**

Because the asserted claims in the '160 Patent, '702 Patent, and '902 Patent are directed to patent-ineligible subject matter, this Court should enter judgment for Microsoft.

DATED: April 12, 2022                              Respectfully submitted,

                                                  */s/ Richard A. Cederoth (by permission)*

                                                  Melissa R. Smith, Bar No. 24001351

melissa@gillamsmithlaw.com
James "Travis" Underwood, Bar No.
24102587
travis@gillamsmithlaw.com
**GILLAM & SMITH, LLP**
303 South Washington Avenue
Marshall, Texas 75670
Tel: (903) 934-8450
Fax: (903) 934-9257

Michael J. Bettinger
mbettinger@sidley.com
Irene Yang
irene.yang@sidley.com
Brooke S. Boll
brooke.boll@sidley.com
**SIDLEY AUSTIN LLP**
555 California Street, Suite 2000
San Francisco, CA 94104
Tel: (415) 772-1200
Fax: (415) 772-7400

Richard A. Cederoth
rcederoth@sidley.com
John W. McBride
jwmcbride@sidley.com
Richard M. Chen
rchen@sidley.com
Kevin Robert Oliver
kevin.oliver@sidley.com
**SIDLEY AUSTIN LLP**
1 South Dearborn St.
Chicago, IL 60603
Tel: (312) 853-7000
Fax: (312) 853-7036

***ATTORNEYS FOR MICROSOFT
CORPORATION***

26