IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| WSOU INVESTMENTS, LLC d/b/a<br>BRAZOS LICENSING AND<br>DEVELOPMENT,<br><br>              Plaintiff,<br><br>   v.<br><br>MICROSOFT CORPORATION,<br><br>              Defendant. | Civil Action No. 6:20-cv-454<br>Civil Action No. 6:20-cv-461<br>Civil Action No. 6:20-cv-465<br><br>PUBLIC VERSION |

**MICROSOFT CORPORATION'S REPLY IN SUPPORT OF
THE MOTION TO EXCLUDE IMPROPER DAMAGES
OPINIONS AND TESTIMONY OF WSOU'S EXPERTS**

## LIST OF EXHIBITS

| Decl. Ex. | Document Name | Document Abbreviation |
|---|---|---|
| Ex. O | Excerpts of the deposition transcript of Stanley A. McClellan, Ph.D., taken on March 31, 2022 | McClellan Dep. |
| Ex. P | Email from B. Barcelo, Susman Godfrey LLP, to A. Casali, TSG Reporting, dated April 26, 2022 | 4/26/22 Barcelo Eml. |
| Ex. Q | Excerpts of *CloudofChange, LLC v. NCR Corp.*, 6:19-CV-00513-ADA, Dkt. 127 (Apr. 29, 2021) | CloudofChange Pretrial Tr. |
| Ex. R | Excerpts of WSOU Investments, LLC d/b/a Brazos Licensing and Development's Supplemental Objections and Responses to Defendant's First Set of Case-Specific Interrogatories, dated April 4, 2022 | WSOU's Response to ROG 7 |
| Ex. S | Excerpts of March 23, 2021 Discovery Hearing | March 23, 2021 Discovery Hrg. |

I.  INTRODUCTION

WSOU's response confirms that Dr. McClellan failed to properly apportion out unpatented features of the accused products and that Messrs. Blok's and Bratic's reasonable royalty analysis is unreliable. WSOU fails to articulate how Dr. McClellan arrived at either (1) the arbitrary technical weights he assigned to a subset of features of Aruba ClearPass, or (2) the values he attributed to the '702 patent. These defects cannot be cured by the eleventh-hour errata submission changing the substance of Dr. McClellan's testimony on which WSOU relies. Nor can WSOU reconcile its assertion that 100 percent of the accused Azure Monitor's value is derived from the '160 and '902 patents with Dr. McClellan's testimony to the contrary. Moreover, WSOU does not even attempt to establish the reliability of Messrs. Blok's and Bratic's allocation of alleged incremental profits based on the ratio of Microsoft's R&D-to-operating expenses, or explain how this analysis is tied to the patents-in-suit or the accused products. WSOU has not met its burden of showing that the R&D-to-operating expenses ratio is the base of a reliable incremental profits analysis. These flaws render Dr. McClellan's apportionment analysis and Messrs. Blok's and Bratic's reliance thereon as well as their reasonable royalty opinions inadmissible.

II. ARGUMENT

    A.    **Dr. McClellan's Technical Apportionment Analysis for the '702 Patent Is Unreliable and Must Be Excluded.**

        1.    **Dr. McClellan Did Not Apportion Out Unpatented Features of Aruba ClearPass**

In performing his apportionment analysis for the '702 patent, Dr. McClellan assigned 100 percent of the value of the third-party Aruba ClearPass product[1] to five "feature sets" while

---

[1] Microsoft does not dispute that an expert may compare features of third-party products to the accused product in forming damages opinions under certain circumstances. However, WSOU's

ignoring "key features" that indisputably drive sales of ClearPass. WSOU notes that Dr. McClellan selected these five feature sets from a ClearPass marketing document, but confirms that his apportionment analysis includes only "two or three of . . . eight" key features identified in that document. Dkt. 160 at 8; *see* also *id.*, Ex. C. WSOU's assertion that Microsoft has not "identified a single feature ignored by Dr. McClellan" is therefore both incorrect and irrelevant. In addition to the aforementioned "key features" from the Aruba ClearPass Policy Manager Data Sheet, Microsoft's opening brief explicitly states that ClearPass implements the RADIUS standard, which includes hundreds of features that Dr. McClellan did not consider. Dkt. 132 at 8 (citing DeKok Rebuttal Rept., ¶111). More importantly, Dr. McClellan *admitted*, and WSOU concedes, that he did not consider "an enormous amount" of ClearPass features because they "are not implicated by the asserted claims of the patent[.]" (*See* McClellan Dep. at 41:2-5 ); Dkt. 160 at 8.

      WSOU downplays the significance of Dr. McClellan's failure to consider this "enormous amount" of ClearPass features by arguing that "such 'features' were merely marketing or sales features that were not relevant to the claims of the '702 patent or to Microsoft's infringing use of the same." Dkt. 160 at 8. But this supports *Microsoft's* position. The fact that features used for sales and marketing of ClearPass are not relevant to the claims of the '702 patent means that Dr. McClellan was required to apportion out these features in his

---

assertion that "use of third-party data is especially proper in the current matter where the defendant has withheld internal documents and/or claimed that no such comparable information exists" is incorrect. Dkt. 160 at 7 n.2. Microsoft has produced hundreds of documents discussing features of the accused Network Policy Server ("NPS"), and has produced source code for four different versions of Windows Server (including the source code for NPS across those versions). There is no reason why Dr. McClellan could not have analyzed features of NPS in performing an apportionment analysis. In any event, Dr. McClellan's analysis of ClearPass is inadmissible for the reasons explained in Microsoft's opening brief and herein.

analysis. *See Niazi Licensing Corp. v. St. Jude Med. S.C. Inc.*, No. 2021-1864, 2022 WL 1072909, at *13 (Fed. Cir. Apr. 11, 2022); *MLC Intell. Prop. LLC v. Micron Tech., Inc.*, 10 F.4th 1358, 1373 (Fed. Cir. 2021). WSOU concedes that he did not do so.

Seeking to avoid compliance with this requirement, WSOU relies on new substantive testimony from Dr. McClellan, submitted via an errata sheet at 11:01 PM on the filing deadline for WSOU's response. *See* 4/26/22 Barcelo Eml. WSOU characterizes its change as a "clarification," Dkt. 160, Ex. G, but a review of the original and altered testimony clearly demonstrates that WSOU and Dr. McClellan added substantive content to Dr. McClellan's testimony at the last minute for the purpose of addressing Dr. McClellan's failure to apportion. *Compare* McClellan Dep. at 27:24-28:4 ("they're add-on features for the purpose of marketing and product sales, not core features that would be concerning to a technologist who is implementing AAA functionality."), *with* Dkt. 160, Ex. G at 228 (altering testimony to "they're add-on features for the purpose of marketing and product sales *that do not add any additional value to the Aruba ClearPass product . . .*").

As an initial matter, this substantive addition to Dr. McClellan's testimony is an improper use of the errata sheet and should not be credited. *See, e.g.*, *Touchcom, Inc. v. Bereskin & Parr*, 790 F. Supp. 2d 435, 465 (E.D. Va. 2011) ("[T]he purpose of an errata sheet is to correct alleged inaccuracies in what the deponent said at his deposition, not to modify . . . what he wishes that he had said.") (citations omitted); *Tuttle v. Tyco Elecs. Installation Servs., Inc.*, No. 2:06-CV-581, 2008 WL 343178, *4 (S.D. Ohio Feb. 7, 2008) ("Rule 30(e) does not allow one to alter what was said under oath. If that were the case, one could merely answer the questions with no thought at all[ ], then return home and plan artful responses. Depositions differ from interrogatories in that regard. A deposition is not a take home examination.") (citations omitted). More importantly,

Dr. McClellan's new testimony renders his statement internally contradictory. Dr. McClellan testified that the features he excluded from his apportionment analysis were "for the purpose of marketing and product sales[.]" McClellan Dep. at 27:24-25. Features that help a company make "product sales" necessarily have value; Dr. McClellan's new assertion that they "do not add any additional value to the Aruba ClearPass product" is therefore nonsensical. Dkt. 160, Ex. G at 228. He simply chose to ignore these features because they are unrelated to the asserted claims of the '702 patent, in contravention of the apportionment requirement.

### 2. Dr. McClellan's Numerical Weights Are "Plucked From Thin Air."

WSOU cannot meaningfully distinguish Dr. McClellan's unsupported assignments of technical weights and evaluations of the weight of each feature attributable to the '702 patent from the analysis that this Court excluded in *CloudofChange*. Despite WSOU's assertion that Dr. McClellan's apportionment "does not begin and end with a bare conclusion[,]" WSOU's characterization of Dr. McClellan's process confirms that his analysis is even more lacking than the analysis of the expert in *CloudofChange*. Dkt. 160 at 10.

In *CloudofChange*, the Court excluded the expert's apportionment analysis despite counsel's explanation that the expert "talks generally about the components of [the relevant technology]" and "has four factors that he goes into great detail over the rest of the report." *CloudofChange* Pretrial Tr. at 19. Specifically, the expert in *CloudofChange*

> talked about the features of point-of-sale systems that commonly offer these high-level components, transaction handling -- and he goes into some detail -- inventory item management, PO -- point-of-sale contact management, POS infrastructure, reporting and security. He continues to explain that it would be the first four of those that he considers to be core.

*Id.* The expert further explained that two additional components of the accused technology were "not critical to the function of POS system but are offered as additional options for customers."

4

*Id.* at 19-20. Based on his identification of core and non-critical features, the expert concluded that 80 percent of the accused system embodied the asserted patented components of the patents-in-suit. *Id.*; *see also* Dkt. 132, Ex. K at 6-7. But this Court held that this explanation of which features were "core" and "not critical" did not suffice as an "explanation on how [the expert] reaches this 80% apportionment" and excluded the analysis. *Id.* at 7; *see also CloudofChange* Pretrial Tr. at 19-25.

Like the inadmissible analysis in *CloudofChange*, Dr. McClellan's percentage calculations are conclusory, and Microsoft has "no way to understand or meaningfully rebut" his numbers. Dkt. 132, Ex. K at 7 (citations omitted). WSOU contends that Dr. McClellan's analysis "starts with a description and categorization of ClearPass feature sets and then provides a step-by-step calculation to reach his conclusion as to relative attributable value[.]" Dkt. 160 at 10. As Microsoft explained in its opening brief, however, Dr. McClellan's "description and categorization of ClearPass feature sets" do not provide a basis for the arbitrarily selected percentages set forth in Table 1 of his report. Dr. McClellan uses terms such as "relatively high" and "the majority of this feature" to support the figures in the first two columns of the table, without providing any methodology for how he arrived at these values. *See* Dkt. 132 at 9-10 (citing McClellan 702 Inf. Rept., ¶¶ 41-42, 44, 46-49). These are exactly the type of "vague qualitative notions of the relative importance" of features that the Federal Circuit has held cannot support an apportionment opinion, *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 69 (Fed. Cir. 2012), and that this Court struck in *CloudofChange*.

Moreover, WSOU's assertion that Dr. McClellan performed a "step-by-step calculation" has no support, and is in fact contradicted by Dr. McClellan's deposition testimony. WSOU identifies a single "step" of calculation: "multiplying each feature set's relative technical weight

5

by its attributable weight" to determine the "relative contribution of ClearPass features covered by the '702 patent." Dkt. 160 at 4. This misses the point. That the third column in Dr. McClellan's table constitutes the product of the first two columns does not explain how Dr. McClellan selected the values of the first two columns in the first place. And Dr. McClellan confirmed that he did not perform any calculations or otherwise replicable process to reach these numerical weights. (McClellan Dep. at 28:23-29:7, 33:5-9.)

WSOU's cited case law does not endorse the "the technical apportionment method utilized by Dr. McClellan in this case" as WSOU asserts. In *Cioffieta v. Google, Inc.*, the defendant argued that the plaintiff's approach was unreliable because it "relies on the allegedly-infringing feature's technical contribution to Chrome, as opposed to its economic contribution." 2:13-cv-00103-JRG, Dkt. 209 at 6 (E.D. Tex. Jan. 9, 2017). The court found that the analyzed features were both "technical" and "economic" attributes based on the fact that they were included in the defendant's marketing brochure on which the expert relied. *Id.* Thus, to the extent that *Cioffieta* bears on this case, it confirms that Dr. McClellan's failure to consider features of ClearPass that he deemed "marketing or sales features that were not relevant to the claims of the '702 patent" was improper.

The portion of *Osseo Imaging, LLC v. Planmeca USA, Inc.* that WSOU cites has no factual connection to this case. There, the Court declined to strike an apportionment analysis "as arbitrary or based on erroneous attribution to non-accused features." No. 17-1386-LPS, Dkt. 153 at 17 (D. Del. Oct. 28, 2020). The opinion contains no analysis of the disputed opinions, and provides no support for the proposition Dr. McClellan's failure to consider certain features of Aruba ClearPass or his arbitrary assignment of values are somehow proper.

Finally, in *Shopify Inc. v. Express Mobile, Inc.*, the court expressly held that the challenged expert "provided a specific analysis explaining why he assigned each particular percentage value" in his apportionment analysis. No. CV 19-439-RGA, 2021 WL 4288113, at *21 (D. Del. Sept. 21, 2021). The court found that *Shopify* expert's opinions were "more than impermissible *ipse dixit*" because the expert "first identified the technical differences between Shopify subscription plans. . . . [The expert] considered the patents-in-suit, Shopify documents (including advertising and user surveys) and testimony, source code, and actual use of the Shopify platform." *Id.* Dr. McClellan's analysis of the third-party ClearPass product, based on an analysis of a small subset of "key features" from a ClearPass marketing document, falls well short of analysis performed in *Shopify*, and does not contain "specific analysis explaining why he assigned each particular percentage value" for the reasons explained above.

### B.  Dr. McClellan Failed to Apportion Out Non-Patented Features Of The Accused Products For The '160 And '902 Patents.

WSOU does not dispute that Dr. McClellan did not perform any apportionment analysis for the '160 or '902 patents. Instead, they assert that no such analysis was required because the accused "Azure Monitor's entire value is derived from these patents-in-suit[.]" Dkt. 160 at 13. This assertion cannot be squared with the record evidence, including statements of WSOU's own experts.

For example, WSOU cannot dispute that Azure Monitor's functionality includes the use of "logs" to store data, and that this functionality is not covered by the '160 patent. WSOU challenges one line of questioning during Dr. McClellan's deposition as "vague[,]" Dkt. 160 at 14-15, but offers no response regarding Dr. McClellan's clear, explicit testimony: "I don't see where the making use of logs is anywhere related to the claim language[,]" (McClellan Dep. at 139:10-12); and "The claim has nothing to do with logs or storage[,]" (*id*. at 136:22-23). WSOU

7

offers no explanation as to how the "full context" of Dr. McClellan's testimony could somehow change his unequivocal statements that the '160 patent does not cover logs or storage.  Dkt. 160 at 14.  And because there is no dispute that Azure Monitor's use of logs to store data has not been apportioned out of Messrs. Blok's and Bratic's royalty base, their reasonable royalty opinions must be excluded.  *See Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1309 (Fed. Cir. 2018).

The same is true with regard to the '902 patent.  WSOU does not dispute that monitoring latency and setting alerts are features of the accused Network Performance Monitor and Network Watcher, or that the '902 patent claims say nothing about these functionalities.  Therefore, the failure to apportion out these features from the proposed royalty base renders Messrs. Blok's and Bratic's opinions inadmissible.  *See id.* ("When the accused technology does not make up the whole of the accused product, apportionment is required.").

        **C.**      **Messrs. Blok's and Bratic's Failure to Tie Their Incremental Profits Analysis to the Patents-In-Suit or the Accused Products Demands Exclusion.**

WSOU does not dispute that the ratio of Microsoft's company-wide R&D-to-operating expenses has no specific tie to the patents-in-suit or the accused products.  Accordingly, this ratio cannot form the base of a reliable incremental profits analysis.  *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011).

Without citing any authority, WSOU suggests that Messrs. Blok and Bratic properly relied on Microsoft's company-wide R&D-to-operating expenses ratio as part of their analysis of *Georgia Pacific* Factor #5 to illustrate "how Microsoft would approach a negotiation in an inventor/promoter relationship."  Dkt. 160 at 16, 18.  But WSOU's characterization of its experts' reliance on this ratio for *qualitative* purposes ignores the unreliable *quantitative* analysis stemming therefrom.  WSOU simply ignores the fact that Messrs. Blok's and Bratic's

8

methodology would yield an identical ▬▬▬▬ split of incremental profits between Nokia and Microsoft in *any* patent license negotiation for *any* patented technology as long as the ratio is calculated over the same time period (as Messrs. Blok and Bratic calculated for both the '160 and '902 patents in this case). WSOU offers no explanation for this absurd conclusion, which necessarily follows from Messrs. Blok's and Bratic's failure to tie their incremental profits analysis to the specific patents and accused technology at issue.

WSOU's failure to address this issue dooms its unavailing attempt to distinguish *Droplets, Inc. v. Yahoo, Inc.*, Case No. 12-cv-03733-JST, Dkt. 1000 (N.D. Cal. Jan. 12, 2022). *See* Dkt. 160 at 18. Just like the damages expert in *Droplets*, Messrs. Blok and Bratic used a financial metric "to allocate profit for the accused products but did not tie [the metric] to the accused product." Dkt. 160 at 18 (citing *Droplets* Order at 6-7). WSOU asserts that because "Messrs. Blok and Bratic are not dividing revenue for a specific accused product[,]" but instead "use Microsoft's company-wide R&D-to-operating expenses ratio as a proxy for the inventor/promoter relationship, no specific allocation of the ratio to revenue for specific products is required." *Id.* Again, WSOU cites no authority for this assertion, and has not provided any basis supporting the reliability of Messrs. Blok's and Bratic's incremental profits allocation in view of their failure to tie this allocation to the facts of the case.

Instead of providing a legally supportable basis for their reliance on Microsoft's R&D-to-operating expenses ratio, WSOU attacks Microsoft's purported "fail[ure] to produce any other documents that discuss how to split the benefit between the parties or for evaluating patent contributions." Dkt. 160 at 16-17 & n.3.[2] Contrary to WSOU's allegations, there is substantial

---

[2] WSOU bears the blame for any purported deficiency. This is the first that Microsoft has heard of this "deficiency," months after discovery has closed. Furthermore, WSOU refused to disclose any aspect of its damages theories during discovery, Microsoft can hardly be faulted for

9

evidence in the record on which WSOU's experts could have relied to analyze Microsoft's royalty practices. Microsoft produced thousands of pages of technical information for the accused products (including source code) marketing documentation, and financial information. WSOU's criticism of Microsoft's productions merely reflects WSOU's disappointment with the fact that it has accused complex products that are sold to sophisticated customers for a host of reasons, many of which have nothing to do with the specifically accused functionalities. And in any event, nothing about Microsoft's productions or corporate testimony changes the fact that Microsoft's company-wide R&D-to-operating expenses ratio is an unreliable basis for an incremental profits allocation. WSOU cites no authority to the contrary.

### III. CONCLUSION

For the foregoing reasons, this Court should exclude the technical apportionment opinions of Dr. McClellan and reasonable royalty opinions of Messrs. Blok and Bratic.

DATED: May 3, 2022

Respectfully submitted,

*/s/ Richard A. Cederoth (by permission)*

Melissa R. Smith, Bar No. 24001351
melissa@gillamsmithlaw.com
James "Travis" Underwood, Bar No. 24102587
travis@gillamsmithlaw.com
**GILLAM & SMITH, LLP**
303 South Washington Avenue
Marshall, Texas 75670
Tel: (903) 934-8450
Fax: (903) 934-9257

Michael J. Bettinger
mbettinger@sidley.com

---

producing ordinary business and marketing documents and related financial information, but not whatever specific documents that WSOU now claims for the first time Microsoft should have produced. *See* WSOU's Response to ROG 7 at 6-7; March 23, 2021 Discovery Hrg., 34:14-22 (denying request for computation of damages and supplemental response prior to service of expert reports).

Irene Yang
irene.yang@sidley.com
Brooke S. Boll
brooke.boll@sidley.com
**SIDLEY AUSTIN LLP**
555 California Street, Suite 2000
San Francisco, CA 94104
Tel: (415) 772-1200
Fax: (415) 772-7400

Richard A. Cederoth
rcederoth@sidley.com
John W. McBride
jwmcbride@sidley.com
Richard M. Chen
rchen@sidley.com
Kevin Robert Oliver
kevin.oliver@sidley.com
**SIDLEY AUSTIN LLP**
1 South Dearborn St.
Chicago, IL 60603
Tel: (312) 853-7000
Fax: (312) 853-7036

***ATTORNEYS FOR MICROSOFT CORPORATION***

## CERTIFICATE OF SERVICE

I, Kevin Robert Oliver, certify that on May 3, 2022, the documents filed with the Clerk of Court via the Court's CM/ECF system under seal in the above-captioned cases were subsequently served on all counsel of record by electronic mail.

DATED: May 3, 2022                                  /s/ *Kevin Robert Oliver*

Kevin Robert Oliver
kevin.oliver@sidley.com
**SIDLEY AUSTIN LLP**
1 South Dearborn St.
Chicago, IL 60603
Tel: (312) 853-7000
Fax: (312) 853-7036

***ATTORNEY FOR MICROSOFT CORPORATION***